UNITED STATES *v.* AMERICAN BAR ENDOWMENT
ET AL.

No. 85–599.   Argued April 28, 1986—Decided June 23, 1986

106

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, BLACKMUN, and REHNQUIST, JJ., joined. STEVENS, J., filed a dissenting opinion, *post*, p. 119. POWELL and O'CONNOR, JJ., took no part in the consideration or decision of the case.

*Albert G. Lauber, Jr.*, argued the cause for the United States. With him on the briefs were *Solicitor General Fried, Acting Assistant Attorney General Olsen, Gary R. Allen*, and *Robert S. Pomerance.*

*Francis M. Gregory, Jr.*, argued the cause for respondents. With him on the brief were *Randolph W. Thrower, Mac Asbill, Jr.*, and *Sheila J. Carpenter.**

JUSTICE MARSHALL delivered the opinion of the Court.

The first issue in this case is whether income that a tax-exempt charitable organization derives from offering group insurance to its members constitutes "unrelated business income" subject to tax under §§ 511 through 513 of the Internal Revenue Code (Code), 26 U. S. C. §§ 511–513. The second issue is whether the organization's members may claim a charitable deduction for the portion of their premium pay-

---

*\*Thomas F. Olson* and *Carl G. Borden* filed a brief for the California Farm Bureau Federation as *amicus curiae* urging affirmance.

ments that exceeds the actual cost to the organization of providing insurance.

I

Respondent American Bar Endowment (ABE) is a corporation exempt from taxation under § 501(c)(3) of the Code, which, with certain exceptions not relevant here, exempts organizations "organized and operated exclusively for . . . charitable . . . or educational purposes." ABE's primary purposes are to advance legal research and to promote the administration of justice, and it furthers these goals primarily through the distribution of grants to other charitable and educational groups. All members of the American Bar Association (ABA) are automatically members of ABE. The ABA is exempt from taxation as a "business league" under § 501(c)(6).

ABE raises money for its charitable work by providing group insurance policies, underwritten by major insurance companies, to its members. Approximately 20% of ABE's members participate in the group insurance program, which offers life, health, accident, and disability policies. ABE negotiates premium rates with insurers and chooses which insurers shall provide the policies. It also compiles a list of its own members and solicits them, collects the premiums paid by its members, transmits those premiums to the insurer, maintains files on each policyholder, answers members' questions concerning insurance policies, and screens claims for benefits.

There are two important benefits of purchasing insurance as a group rather than individually. The first is that ABE's size gives it bargaining power that individuals lack. The second is that the group policy is experience rated. This means that the cost of insurance to the group is based on that group's claims experience, rather than general actuarial tables. Because ABA members have favorable mortality and morbidity rates, experience rating results in a substantially lower insurance cost. When ABE purchases a group policy

for its members, it pays a negotiated premium to the insurance company. If, as is uniformly true, the insurance company's actual cost of providing insurance to the group is lower than the premium paid in a given year, the insurance company pays a refund of the excess, called a "dividend," to ABE. Critical to ABE's fundraising efforts is the fact that ABE requires its members to agree, as a condition of participating in the group insurance program, that they will permit ABE to keep all of the dividends rather than distributing them pro rata to the insured members.

It would be possible for ABE to negotiate lower premium rates for its members than the rates it has charged throughout the relevant period, and thus receive a lower dividend. However, ABE prices its policies competitively with other insurance policies offered to the public and to ABE members. 761 F. 2d 1573, 1575 (CAFC 1985). In this way ABE is able to generate large dividends to be used for its charitable purposes. In recent years the total amount of dividends has exceeded 40% of the members' premium payments. *Ibid.* ABE advises its insured members that each member's share of the dividends, less ABE's administrative costs, constitutes a tax-deductible contribution from the member to ABE. Thus the after-tax cost of ABE's insurance to its members is less than the cost of a commercial policy with identical coverage and premium rates.

In 1980 the Internal Revenue Service (IRS) advised ABE that it considered ABE's insurance plan an "unrelated trade or business" and that the profits thereon were subject to tax under §§ 511–513. Subsequently IRS audited ABE's tax returns for 1979 and 1980 and assessed a tax deficiency on ABE's net revenues from the insurance program. ABE paid those taxes, as well as taxes on the 1981 revenues. After exhausting administrative remedies, it brought an action for a refund in the Claims Court, arguing that its revenues from the insurance program were not subject to tax. At approximately the same time, the individual respondents, who were

participants in the ABE insurance program but who had not originally deducted any part of the insurance premiums as charitable contributions, brought suit for refunds in the Claims Court as well. The individual respondents argued that they were entitled to charitable deductions for a portion of those premium payments. The two suits were consolidated for trial in the Claims Court.

The Claims Court entered judgment for ABE in its suit, finding that ABE's provision of insurance to its members did not constitute a "trade or business" subject to tax. 4 Cl. Ct. 404 (1984). It found for the Government, however, on the individual respondents' claims. The court concluded that a taxpayer may claim a charitable contribution for a portion of a payment for goods or services only when he can show that "he bought goods or services for more than their economic value, with the intention that the excess be used to benefit a charitable enterprise," *id.*, at 415 (citation omitted), and that the individual respondents had not established these facts. The Court of Appeals for the Federal Circuit affirmed as to ABE's taxes. 761 F. 2d, at 1577. As to the individual respondents, however the court reversed and remanded for further factfinding. We granted the Government's petition for certiorari on both issues, 474 U. S. 1004 (1985), and we now reverse.

## II

We recently discussed the history and structure of the unrelated business income provisions of the Code in *United States* v. *American College of Physicians,* 475 U. S. 834 (1986). The Code imposes a tax, at ordinary corporate rates, on the income that a tax-exempt organization obtains from an "unrelated trade or business . . . regularly carried on by it." §§ 512(a)(1), 511(a)(1). An "unrelated trade or business" is "any trade or business the conduct of which is not substantially related . . . to the exercise or performance by such organization of its charitable, educational, or other purpose," § 513(a). The Code thus sets up a three-part test.

ABE's insurance program is taxable if it (1) constitutes a trade or business; (2) is regularly carried on; and (3) is not substantially related to ABE's tax-exempt purposes. Treas. Reg. § 1.513–1(a), 26 CFR § 1.513–1(a) (1985); *American College of Physicians, supra,* at 838–839. ABE concedes that the latter two portions of this test are satisfied. 761 F. 2d, at 1576. Its defense is based solely on the proposition that its insurance program does not constitute a trade or business.

## A

In the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 487, Congress defined a "trade or business" as "any activity which is carried on for the production of income from the sale of goods or the performance of services," § 513(c). The Secretary of the Treasury has provided further clarification of that definition in Treas. Reg. § 1.513–1(b) (1985), which provides: "in general, any activity of [an exempt] organization which is carried on for the production of income and which otherwise possesses the characteristics required to constitute 'trade or business' within the meaning of section 162" is a trade or business for purposes of 26 U. S. C. §§ 511–513.[1]

ABE's insurance program falls within the literal language of these definitions. ABE's activity is both "the sale of goods" and "the performance of services," and possesses the

---

[1] Section 162 permits a taxpayer to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Undoubtedly due to the desirability of tax deductions, § 162 has spawned a rich and voluminous jurisprudence. The standard test for the existence of a trade or business for purposes of § 162 is whether the activity "was entered into with the dominant hope and intent of realizing a profit." *Brannen* v. *Commissioner,* 722 F. 2d 695, 704 (CA11 1984) (citation omitted). Thus several Courts of Appeals have adopted the "profit motive" test to determine whether an activity constitutes a trade or business for purposes of the unrelated business income tax. See *Professional Insurance Agents of Michigan* v. *Commissioner,* 726 F. 2d 1097 (CA6 1984); *Carolinas Farm & Power Equipment Dealers* v. *United States,* 699 F. 2d 167 (CA4 1983); *Louisiana Credit Union League* v. *United States,* 693 F. 2d 525 (CA5 1982).

general characteristics of a trade or business. Certainly the assembling of a group of better-than-average insurance risks, negotiating on their behalf with insurance companies, and administering a group policy are activities that can be—and are—provided by private commercial entities in order to make a profit. ABE itself earns considerable income from its program. Nevertheless, the Claims Court and Court of Appeals concluded that ABE does not carry out its insurance program in order to make a profit. The Claims Court relied on the former Court of Claims holding, in *Disabled American Veterans* v. *United States*, 650 F. 2d 1178, 1187 (1981), that an activity is a trade or business only if "operated in a competitive, commercial manner." See 4 Cl. Ct., at 409. Because ABE does not operate its insurance program in a competitive, commercial manner, the Claims Court decided, that program is not a trade or business. The Court of Appeals adopted this reasoning. 761 F. 2d, at 1577.

The Claims Court rested its conclusion on four factors. First, it found that "the program was devised as a means for fundraising and has been so presented and perceived from its inception." 4 Cl. Ct., at 409. Second, the court found that the program's phenomenal success in generating dividends for ABE was evidence of noncommercial behavior. The court noted that ABE's insurance program has provided $81.9 million in dividends in its 28 years of operation, and concluded that such large profits could not be the result of commercial success, but must proceed from the generosity of ABE's members. Third, and most important, in the court's view, was the fact that ABE's members collectively had the power to change ABE's conduct of the insurance program so as to drastically reduce premiums. That the members had not done so was strong evidence that they sought to further ABE's charitable purposes by paying higher insurance rates than necessary. Fourth, because ABE did not underwrite insurance or act as a broker, it was not competing with other commercial entities.

It appears, then, that the Claims Court viewed ABE as engaging in two separate activities—the provision of insurance and the acceptance of contributions in the form of dividends. If so, the unspoken premise of the Claims Court's decision is that ABE's income is not a result of the first activity, but of the second. There is some sense to this reasoning; should ABE sell a product to its members for more than that product's fair market value, it could argue to the IRS that the members intended to pay excessive prices as a form of contribution, and that some formula should be adopted to separate the income received into taxable profits and nontaxable contributions. Even if we viewed it as appropriate for the federal courts to engage in such a quasi-legislative activity, however, there is no factual basis for the Claims Court's attempt to do so in this case.

## B

We cannot agree with the Claims Court that the enormous dividends generated by ABE's insurance program demonstrate that those dividends cannot constitute "profits." Were ABE's insurance markedly more expensive than other insurance products available to its members, but ABE nevertheless kept the patronage of those members, we might plausibly conclude that generosity was the reason for the program's success. The Claims Court did not find, however, that this was the case. ABE prices its insurance to remain competitive with the rest of the market. *Id.*, at 406. Thus ABE's members never squarely face the decision whether to support ABE or to reduce their own insurance costs.

The Claims Court concluded that "such profit margins [as ABE's] cannot be maintained year after year in a competitive market." *Id.*, at 410. The court apparently reasoned that ABE's staggering success would inevitably induce other firms to offer similar programs to ABA members unless that success is the result of charitable intentions rather than price-sensitive purchasing decisions. It is possible, of

course, that ABE's members genuinely intend to support ABE by paying higher premiums than necessary, and would pay those high premiums even if a competing group insurance plan offered very low premiums. But that is by no means the only possible explanation for the market's failure to provide competition for ABE.[2] Lacking a factual basis for concluding that generosity is at the core of ABE's success, we can easily view this case as a standard example of monopoly pricing. ABE has a unique asset—its access to the ABA's members and their highly favorable mortality and morbidity rates—and it has chosen to appropriate for itself all of the profit possible from that asset, rather than sharing any with its members.

The argument that ABE's members could change the insurance program and receive the bulk of the dividends themselves if they so desired is unconvincing. Were ABE to give each member a choice between retaining his pro rata share of dividends or assigning them to ABE, the organization would have a strong argument that those dividends constituted a voluntary donation. That, however, is not the case here. ABE requires its members to assign it all dividends as a condition for participating in the insurance program. It is sim-

---

[2] One obvious consideration is that ABE's tax-exempt status would make it difficult for private firms to compete, see *infra*, at 114–115. In addition, as the Claims Court recognized, 4 Cl. Ct. 404, 414 (1984), the provision of group insurance coverage to a particular group may have the characteristics of a natural monopoly. The potential savings in insurance costs might decrease rapidly as the group splits into competing components. Finally, if the cost of assembling information about a particular group and maintaining an accurate list of members is high, the provision of group insurance might be economically feasible only if that cost can be shared among a variety of services performed by the group policyholder. In that case preexisting groups like the ABA or a trade association would obviously have a considerable advantage over new entrants. The record here is barren of facts concerning these hypotheses, and we express no opinion as to their accuracy. We present them, however, to demonstrate that it is incorrect to assume, as did the courts below, that ABE's profitability must result from the generosity of its members.

ply incorrect to characterize the assignment of dividends by each member as "voluntary" simply because the members theoretically could band together and attempt to change the policy.

Again, the Claims Court put too much weight on an unsupported assumption. It found that the program was "operated with the approval and consent of the ABA membership," *ibid.*, observing that the program had met with "surprisingly little dissent," *id.*, at 411, even though there were "ample" opportunities for members to change policies with which they disagreed, *ibid.* We believe that those facts cannot carry the weight that the Claims Court put on them. Perhaps each member that purchases insurance would, given the option, pay excessive premiums in order to support ABE's charitable purposes; however, that is not the only possible explanation for the members' failure to change the program. Any given member might feel that the potential savings in insurance costs are not sufficient to justify the effort required to mount a challenge to ABE's leadership. Many might not want to "make waves" and upset a program that generates tax-free income for ABE and charitable deductions for their fellow members. The members' theoretical ability to change the program, therefore, is at best inconclusive.

The Claims Court also erred in concluding that ABE's insurance program did not present the potential for unfair competition. The undisputed purpose of the unrelated business income tax was to prevent tax-exempt organizations from competing unfairly with businesses whose earnings were taxed. H. R. Rep. No. 2319, 81st Cong., 2d Sess., 36 (1950); see *United States* v. *American College of Physicians*, 475 U. S., at 838. This case presents an example of precisely the sort of unfair competition that Congress intended to prevent. If ABE's members may deduct part of their premium payments as a charitable contribution, the effective cost of ABE's insurance will be lower than the cost of competing policies that do not offer tax benefits. Similarly, if ABE

may escape taxes on its earnings, it need not be as profitable as its commercial counterparts in order to receive the same return on its investment. Should a commercial company attempt to displace ABE as the group policyholder, therefore, it would be at a decided disadvantage.

The Claims Court failed to find any taxable entities that compete with ABE, and therefore found no danger of unfair competition. It is likely, however, that many of ABE's members belong to other organizations that offer group insurance policies. Employers, trade associations,[3] and financial services companies frequently offer group insurance policies. Presumably those entities are taxed on their profits, and their policyholders may not deduct any part of the premiums paid. Such entities may therefore find it difficult to compete for the business of any ABE members who are otherwise eligible to participate in these group insurance programs.

The only valid argument in ABE's favor, therefore, is that the insurance program is billed as a fundraising effort. That fact, standing alone, cannot be determinative, or any exempt organization could engage in a tax-free business by "giving away" its product in return for a "contribution" equal to the market value of the product. ABE further contends that it must prevail because the Claims Court found that ABE's profits represent contributions rather than business income; ABE argues that we may not upset that finding unless it is

---

[3] The unrelated business income cases cited in n. 1, *supra*, all concerned group insurance programs offered by trade associations to their members. In each case the Court of Appeals held that those programs constituted a taxable trade or business. The Claims Court distinguished those cases on the grounds that they involved organizations exempt as business leagues under § 501(c)(6) rather than as charities under § 501(c)(3). That distinction, however, is insubstantial. Business leagues engage in fundraising for exempt purposes just as charities do. The taxpayers in those cases could have claimed that the excess dividends constituted tax-exempt membership fees, just as ABE claims that they constitute tax-exempt charitable contributions. Both claims fail for the same reasons.

clearly erroneous. Cf. *Carter* v. *Commissioner*, 645 F. 2d 784, 786 (CA9 1981) (question of profit motive for purposes of § 162 is one of fact). The undisputed facts, however, simply will not support the inference that the dividends ABE receives are charitable contributions from its members rather than profits from its insurance program. Moreover, the Claims Court failed to articulate a legal rule that would permit it to split ABE's activities into the gratuitous provision of a service and the acceptance of voluntary contributions, and we find no such rule in the Code or regulations. Even if we assumed, however, that the court's failure to attach the label "trade or business" to ABE's insurance program constitutes a finding of fact, we would be constrained to hold that finding clearly erroneous.

## III

Section 170 of the Code provides that a taxpayer may deduct from taxable income any "charitable contribution," defined as "a contribution or gift to or for the use of" qualifying entities, § 170(c). The individual respondents contend that the excess of their premium payments over the cost to ABE of providing insurance constitutes a contribution or gift to ABE.

Many of the considerations supporting our holding that ABE's earnings from the insurance program are taxable also bear on the question whether ABE's members may deduct part of their premium payments. The evidence demonstrates, and the Claims Court found, that ABE's insurance is no more costly to its members than other policies—group or individual—available to them. Thus, as we have recognized, ABE's members are never faced with the hard choice of supporting a worthwhile charitable endeavor or reducing their own insurance costs.

A payment of money generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return. S. Rep. No. 1622, 83d Cong., 2d Sess.,

196 (1954); *Singer Co.* v. *United States,* 196 Ct. Cl. 90, 449 F. 2d 413 (1971). However, as the Claims Court recognized, a taxpayer may sometimes receive only a nominal benefit in return for his contribution. Where the size of the payment is clearly out of proportion to the benefit received, it would not serve the purposes of § 170 to deny a deduction altogether. A taxpayer may therefore claim a deduction for the difference between a payment to a charitable organization and the market value of the benefit received in return, on the theory that the payment has the "dual character" of a purchase and a contribution. See, *e. g.,* Rev. Rul. 67–246, 1967–2 Cum. Bull. 104 (price of ticket to charity ball deductible to extent it exceeds market value of admission); Rev. Rul. 68–432, 1968–2 Cum. Bull. 104, 105 (noting possibility that payment to charitable organization may have "dual character").

In Rev. Rul. 67–246, *supra,* the IRS set up a two-part test for determining when part of a "dual payment" is deductible. First, the payment is deductible only if and to the extent it exceeds the market value of the benefit received. Second, the excess payment must be "made with the intention of making a gift." 1967–2 Cum. Bull., at 105. The Tax Court has adopted this test, see *Murphy* v. *Commissioner,* 54 T. C. 249, 254 (1970); *Arceneaux* v. *Commissioner,* 36 TCM 1461, 1464 (1977); but see *Oppewal* v. *Commissioner,* 468 F. 2d 1000, 1002 (CA1 1972) (expressing "dissatisfaction with such subjective tests as the taxpayer's motives in making a purported charitable contribution" and relying solely on differential between amount of payment and value of benefit).

The Claims Court applied that test in this case, and held that respondents Broadfoot, Boynton, and Turner had not established that they could have purchased comparable insurance for less money. Therefore, the court held, they had failed to establish that the value of ABE's insurance to them was less than the premiums paid. 4 Cl. Ct., at 415–417. Respondent Sherwood demonstrated that there did exist a

group insurance program for which he was eligible and which offered lower premiums than ABE's insurance. However, Sherwood failed to establish that he was aware of that competing program during the years at issue. Sherwood therefore had failed to demonstrate that he met the second part of the above test—that he had intentionally paid more than the market value for ABE's insurance because he wished to make a gift.

The Court of Appeals, in reversing, held that the Claims Court had focused excessively on the taxpayers' motivation. In the Court of Appeals' view, the necessary inquiry was whether "the transaction was . . . of a business and not a charitable nature," considering all of the circumstances. 761 F. 2d, at 1582. The Court of Appeals therefore remanded for redetermination under that standard.

We hold that the Claims Court applied the proper standard. The *sine qua non* of a charitable contribution is a transfer of money or property without adequate consideration. The taxpayer, therefore, must at a minimum demonstrate that he purposely contributed money or property in excess of the value of any benefit he received in return. The most logical test of the value of the insurance respondents received is the cost of similar policies. Three of the four individual respondents failed to demonstrate that they could have purchased similar policies for a lower cost, and we must therefore assume that the value of ABE's insurance to those taxpayers at least equals their premium payments. Had respondent Sherwood known that he could purchase comparable insurance for less money, ABE's insurance would necessarily have declined in value to him. Because Sherwood did not have that knowledge, however, we again must assume that he valued ABE's insurance equivalently to those competing policies of which he was aware. Because those policies cost as much as or more than ABE's, Sherwood has failed to demonstrate that he intentionally gave away more than he received.

## IV

We hold that ABE's insurance program is a "trade or business" for purposes of the unrelated business income tax. We further hold that the individual taxpayers have not established that any portion of their premium payments to ABE constitutes a charitable contribution. Accordingly, we reverse the judgment of the Court of Appeals and remand to that court with instructions to reverse the judgment of the Claims Court with respect to ABE and to affirm the judgment of the Claims Court with respect to the individual taxpayers.

*It is so ordered.*

JUSTICE POWELL and JUSTICE O'CONNOR took no part in the consideration or decision of this case.

JUSTICE STEVENS, dissenting.

The charitable work of the American Bar Endowment is funded, in large part, through a procedure in which the Endowment provides insurance policies for participating American Bar Association members, and the members assign the dividends to the ABE. The primary question presented is whether that assignment of dividends is taxable as an unrelated "trade or business."

"The problem at which the tax on unrelated business income is directed . . . is primarily that of unfair competition."[1] The unrelated business tax was adopted in 1950,

---

[1] H. R. Rep. No. 2319, 81st Cong., 2d Sess., 36 (1950). See also *United States* v. *American College of Physicians,* 475 U. S. 834, 838 (1986) ("Congress perceived a need to restrain the unfair competition fostered by the tax laws"); *ante,* at 114 ("The undisputed purpose of the unrelated business income tax was to prevent tax-exempt organizations from competing unfairly with businesses whose earnings were taxed"); Treas. Reg. § 1.513–1(b), 26 CFR § 1.513–1(b) (1985) (Congress enacted the unrelated business tax "to eliminate a source of unfair competition by placing the unrelated business activities of certain exempt organizations upon the same tax basis as the nonexempt business endeavors with which they compete").

and substantially revised in 1969. It is useful to recall the kind of situation that gave rise to the unrelated business tax. Perhaps the best known case involved the C. F. Mueller Company. The Mueller Company was a longstanding macaroni concern. It was acquired and operated for the benefit of the New York University School of Law, and its profits were donated to the University. The Internal Revenue Service claimed that the macaroni company's profits should be taxable, like any other competitive macaroni company, to avoid giving this competitor an unfair advantage. Although longstanding precedent seemed to be against the Commissioner, the Tax Court was sufficiently concerned about the implications that it agreed with the Commissioner. Ultimately, the Court of Appeals reversed, relying on precedent; by that time, however, Congress had acted and imposed a tax on unrelated business income. See *C. F. Mueller Co.* v. *Commissioner*, 190 F. 2d 120 (CA3 1951).

In considering the ABE insurance fundraising, then, it is appropriate to assume that, if the ABE were funded by operating a normal macaroni company and receiving an unfair competitive advantage from its tax exemption, it would be a "trade or business" within the Act and taxable. On the other hand, it is equally clear that, if the ABE simply provided insurance for ABA members at very low cost, and sent the insurance dividends with an urgent request that the dividends be assigned to the Endowment, the arrangement would not be a "trade or business," and would not be taxable.[2] The

---

[2] See Tr. of Oral Arg. 16 (Solicitor General's argument) ("If the Endowment were to refund the dividends to the members and the members were then voluntarily and individually to donate the money back to the Endowment, it is clear, and the IRS has agreed that the members would then be entitled to a charitable contribution deduction and that that money would come into the hands of the Endowment as charitable receipts, not as business income"). See also Brief for United States 24–25 ("If the Endowment had instead consented to rebate the dividends to its members, coupling such rebates with a request that the members voluntarily contribute the dividends back to it, it would have a strong claim that funds thus contrib-

central issue in this case is thus whether the ABE's insurance program should be viewed as akin to the macaroni company, and thus a "trade or business," or as akin to the dividend assignment request, and thus not a "trade or business."

I believe that the ABE's activities are far closer to the latter than the former for two reasons. First, there is no danger of unfair competition, the problem that the unrelated business tax addresses. Second, the program has functioned as a charitable fundraising effort, rather than as a business.

## I

An understanding of the purpose of the unrelated business income tax exposes a basic error in the Court's analysis. As noted, that purpose is to protect commercial enterprises from the unfair competition that may be generated by the operation of competing businesses by tax-free organizations. There is no evidence in the record, despite more than three weeks of trial and numerous witnesses, to support the notion that the Endowment's provision of insurance to its members has had any competitive impact whatsoever. The Court relies on a parade of hypotheticals to justify its conclusion that there is some effect on competition.[3] The Court is, however, unable to point to a single piece of evidence in the

uted were derived 'from' charitable solicitations rather than 'from' its insurance business"); *id.*, at 37 ("Had the Endowment requested its members individually to return their dividends as an act of generosity, it would have dealt with them as a charity"); *ante*, at 113 ("Were ABE to give each member a choice between retaining his pro rata share of dividends or assigning them to ABE, the organization would have a strong argument that those dividends constituted a voluntary donation").

[3] See *ante*, at 115 ("It *is likely* . . . that many of ABE's members belong to other organizations that offer group insurance policies"); *ibid.* ("Employers, trade associations, and financial services companies *frequently* offer group insurance policies"); *ibid.* ("*Presumably* those entities are taxed on their profits"); *ibid.* ("Such entities *may* therefore find it difficult to compete for the business of any ABE members who are otherwise eligible to participate in these group insurance programs") (emphases added).

record to justify its conclusion about the effect on competition. "Speculation about hypothetical cases illuminates the discussion in a classroom, but it is evidence and historical fact that provide the most illumination in a courtroom." *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority*, 476 U. S. 573, 586 (1986) (STEVENS, J., dissenting). The trial judge scoured the record for evidence pointing to a harmful effect on competition, and found none.[4] The ab-

---

[4] In its oral opinion at the end of trial, the Claims Court emphasized the absence of a "Ronzoni"—the macaroni-selling competitor who had been harmed by New York University's tax-free entry into the business:

"The unrelated business income tax was passed to avoid a certain kind of evil. . . . So you go back and look at what evil there is in the market. What was Congress trying to do . . . when the . . . tax was passed, and one comes to the frequently-asked question, 'Who is Ronzoni.'

"Now, nobody has really satisfactorily pointed to Ronzoni for me. I have been listening for three weeks of trial and nobody came up and said, 'Here, this is Ronzoni, this is the competitor that will be adversely affected in the manner in which Congress feared there would be adverse effects when it slapped Mueller Macaroni Company on the wrist, or basically said you cannot do that, you cannot use your . . . tax exempt status to make profits.[']

"And I am still somewhat nebulous as to who Ronzoni is, as to who is hurt, who is damaged if members of the association on the one hand allow the association to use its group asset in order to raise funds.

.    .    .    .    .

"And . . . perhaps other witnesses and other economists, on a different record, somebody will be able to point out to me Ronzoni in this . . . picture, but I have tried very hard, and looking at the policies of the tax, the policies of the unrelated business income tax, I have not been able to find the evils that Congress sought to alleviate by passing that tax." App. 507–509.

In the published opinion, the Claims Court incorporated its earlier oral opinion, 4 Cl. Ct. 404, 405, n. 1 (1984), and reiterated that the record did not support a finding of a harmful effect on competition:

"The absence of any identifiable business over which the ABE is able to gain an unfair advantage supports the conclusion that its activities are not commercial and therefore not a business. At the very least, it suggests that nothing in the policies underlying the [unrelated business tax] requires that the Endowment's activities be taxed. Indeed, it appears that

sence of evidence in the record, rather than the Court's ruminations about possibilities and likelihoods, should control our analysis.

The legislative history further underscores the fact that the ABE insurance operation poses none of the possible effects on competition that the unrelated business tax was intended to address. Congress has twice made clear that insurance programs by other nonprofit organizations are not subject to the unrelated business tax. When Congress substantially revised the unrelated business tax in 1969, the accompanying legislative history emphasized that the group insurance policies provided by fraternal organizations were not intended to be subject to the unrelated business tax.[5] Similarly, when a question arose concerning the taxability of income from insurance programs administered by veterans' organizations, Congress enacted legislation to ensure that the insurance income would not be taxed.[6] Indeed, Con-

---

the Endowment's activities have an entirely procompetitive effect, fully consistent with the policies of the [unrelated business tax]. The congressional purpose behind the statute would therefore not be served by holding that the Endowment was engaging in a business activity by operating the insurance program." *Id.*, at 414.

[5] See H. R. Rep. No. 91–413, p. 47 (1969) ("In extending the unrelated business income tax to virtually all exempt organizations . . . the bill continues to exclude from 'unrelated business income,' earnings from business related to an organization's exempt function—such as an insurance business run by a fraternal beneficial association for its members"); S. Rep. No. 91–552, p. 68 (1969) ("[I]f the fraternal beneficiary society directly provides insurance for its members and their dependents, or arranges with an insurance company to make group insurance available to them, the amounts received by the society from its members for providing, or from the insurance company for arranging, for this exempt function will continue to be excluded from the unrelated business income tax").

[6] See S. Rep. No. 92–1082, pp. 2–3 (1972) (The "1969 Act extended the application of the unrelated business income tax to virtually all exempt organizations, including social welfare organizations and social clubs. . . . As a result, questions have been raised as to whether the income derived by veterans' organizations from their insurance activities is now subject to the unrelated business income tax. . . . [I]t was made clear in a 1969 Act

124

gress found the taxation of the veterans' insurance operations so contrary to its intent that it took the unusual step of making the 1972 amendment fully retroactive to 1969.[7]

The Government argues that these developments actually support its position because the need for congressional attention, and the emphasis on the "substantially related" prong for the fraternal societies, reveal that, without such attention, and without such a substantial relationship, the activity should be presumptively taxable. Particularly when the general legislative purpose of preventing unfair competition is considered, however, these legislative developments have a different significance. For they highlight the fact that the "market" in which the ABE is competing, even temporarily leaving aside the complete absence of evidence of harm to competitors, is itself already partially exempt from the unrelated business income tax provisions, and the possible threat to competition becomes all the more hypothetical and remote.

Ironically, moreover, the tax-exempt alternative suggested by the Government would have a far more obvious effect on competition than the ABE's current fundraising process. For the ABE would then be offering insurance rates dramatically lower than those available elsewhere. If speculation of the kind indulged in by the majority is appropriate, that speculation surely should include the realization that the tax-exempt alternative—in which the ABE would merely recover its actual costs of managing the program and return all of the premium refunds to the individual policyholders—would attract more than the 20% of the ABA membership

---

committee report that income from insurance activities of fraternal beneficiary associations would be exempt from the unrelated business income tax. The committee agrees with the House that there was no reason not to provide similar treatment for exempt veterans' organizations").

[7] See id., at 3 ("Since the committee believes that there was no specific intent to tax the insurance income of veterans' organizations by the 1969 Act, it, therefore, believes it is appropriate to make the exemption of their insurance income from the unrelated business income tax effective as of the effective date of the Tax Reform Act").

that currently hold ABE policies; it would appeal to those who simply want an insurance bargain rather than those who also want to make a charitable contribution.[8]

It is not completely surprising that a consideration of the purpose of the unrelated business tax in light of the record developed at the extensive trial leads to a conclusion that the ABE's program should not be taxed. For the Government itself initially held such a view.[9] Furthermore, the ABE's insurance program was initiated in 1955 as a pioneering, and widely publicized, effort in charitable fundraising. When Congress revamped the unrelated business tax in 1969, there was no suggestion that it was intended to apply to this venerable and successful program, and the IRS did not so interpret it until several years later.

In short, a proper consideration of the purpose of the unrelated business tax leads to a conclusion that the ABE's insurance program is not a "trade or business."[10]

## II

Not only does the ABE program completely fail to raise the concerns against which the unrelated business tax is directed, but it is also operated as a charitable fundraising endeavor.

The learned trial judge expressly found, after hearing a good deal of evidence, that the assignment of the dividends

---

[8] Cf. 4 Cl. Ct., at 414 ("Had the program been operated entirely as a service, offering the lowest possible rates, many more members would have joined the program and there would have been greater concentration of business in the two insurance carriers").

[9] See I. R. S. Letter Ruling 8042012 (July 3, 1980) (citing technical advice memorandum of January 31, 1973, which concluded that ABE's insurance program was not a business); 4 Record 854. See also 4 Cl. Ct., at 414.

[10] Cf. *Hope School* v. *United States*, 612 F. 2d 298, 304 (CA7 1980) (Sprecher, J.) ("unfair competition is the key to whether the activities of the Hope School constitute an unrelated trade or business as a matter of law").

was the result of charitable intentions, rather than a commercial transaction. First, he found that, since the program's inception, for three decades, the ABE has trumpeted the insurance program as a charitable fundraising activity, and that it has been so understood.[11] The trial court emphasized that even members who testified against the ABE viewed the insurance program as strictly a charitable fundraising effort.[12] Second, the court specifically found that the reason for the Endowment's enormous profits was the charitable intent of the members.[13] Finally, the court emphasized that, all of the factors of the program, taken together, compel the conclusion that the ABE procedure was operated as, and understood to be, charitable fundraising rather than a business.[14]

---

[11] See 4 Cl. Ct., at 409 ("Advertising and other promotional materials consistently referred to the use of dividends for the Endowment's charitable endeavors; the Endowment's annual reports discussed the insurance program as a source of charitable contributions; communications to policyholders consistently referred to the Endowment's retention of dividends as donations, not as profits. In short, both the ABE leadership and the insured members considered the insurance program a fundraising activity and treated it as such").

[12] See id., at 409, n. 5 ("Even those ABE members who testified for the defendant appeared to share this view. While these witnesses disagreed with the manner in which the program was operated and would have preferred to pay lower premiums by terminating the program's fundraising function, they certainly never suggested that the Endowment was operating a business which was profiting at their expense").

[13] See id., at 411–412 ("The amount of money ABE is permitted to retain far exceeds the value of any service it may be providing through the operation of the insurance programs. It is quite obvious, then, that this money was not earned 'from the sale of goods or the performance of services,' 26 U. S. C. § 513 (c) (1976), but for some other reason. That reason was the intent of the members to support the Endowment's charitable activities").

[14] The trial judge found:

"When taken together, these factors make it impossible to conclude that the insurance programs were operated by ABE in a competitive, commercial manner. The Endowment raised huge sums of money by its activities, sums wholly unrelated to the value of any service it provided and which

Notwithstanding the Court of Appeals' explicit endorsement of the trial judge's findings,[15] this Court speculates that the members' assignment of their premium refunds was not "voluntary" because the assignment was a condition to participating in the insurance program.[16] This speculation rests on a remarkably unrealistic appraisal of the intelligence and independence of the lawyers who participate in the ABE program. Those who elected to buy the insurance and contribute the premium refunds to the Endowment clearly understood the legal consequences of the transaction, and were free to purchase insurance elsewhere if they did not want to make the requested charitable contribution.[17]

---

dwarfed the profit margins of insurance-related businesses. It disclosed the relevant facts to its members at every available opportunity, yet the members (who bore the economic cost of this program) allowed the practice to continue although they collectively had the power to change it. No business could operate in this fashion. . . . One would have to assume that ABA/ABE members have been subject to an epidemic of irrationality in permitting themselves to be bilked in this manner for almost three decades. The far more reasonable explanation is that the members are entirely rational and are permitting the ABE to collect such substantial revenues at their expense because they consider the Endowment to be engaged in fundraising, which they support. By any standard, an enterprise that depends on the consent of its customers for its profits is not operating in a commercial manner and is not a trade or business." *Id.*, at 411.

[15] "In this connection the Claims Court specifically and permissibly rejected the Government's contention that the dividends represent a payment for the Endowment's services. Because the Endowment's accumulation of funds was not the result of a commercial exchange, we agree with the Claims Court's view that the dividends do not constitute 'profits' which fall within the definition of section 513(c)." 761 F. 2d 1573, 1578 (CAFC 1985) (footnote omitted).

[16] See *ante*, at 113 ("It is simply incorrect to characterize the assignment of dividends by each member as 'voluntary' simply because the members theoretically could band together and attempt to change the policy").

[17] The Court's description of the insurance program is also somewhat misleading. For example, it states that "the after-tax cost of ABE's insurance to its members is less than the cost of a commercial policy with identical coverage and premium rates." *Ante*, at 108. This statement assumes, contrary to the Court's holding, that the assignment of the member's pre-

The Court's opinion also seems to rest on the notion that the ABE members who purchased insurance were somehow coerced by a monopolist.[18] But this is absurd. There is nothing in the record to suggest that the insurance policy offered by the ABE to its members was so attractive that the ABE could foist some unwanted condition upon its members. After all, only 20% of the membership purchased the policies. This transaction has none of the earmarks of an improper tying arrangement.[19]

Finally, the Court states that "there is no factual basis" for an assumption that the large revenues generated by the insurance program were the result of the members' charitable motivation rather than the market value of the insurance package, see *ante*, at 112–113. But this is what the Claims Court found:

"I am persuaded that if the American Bar Association Plan were not viewed as a fundraising enterprise and were not viewed by the overwhelming majority of the membership as something to be tolerated as, to be sure,

---

mium refund is a tax-deductible contribution by the member to the ABE. Even on this assumption, however, the statement is inaccurate. Assume an ABE annual premium of $100, a refund of $40, and a 50% tax bracket for the member: After-tax cost is then $80. Identical coverage and premium rates for a non-ABE member (with the $40 refund retained by the policyholder) would produce a net cost of only $60. Only if one assumes "identical coverage and premium rates" but a $40 refund in the ABE case and no refund in the non-ABE case would the Court's statement be accurate. But then the disparity would be attributable to the differing refunds, not to the deductibility of the contribution. The Court seems to assume that a tax deduction is more valuable than cash. No wonder it is unable to recognize the charitable character of the assignments described in this record.

[18] Cf. *ante*, at 113 (suggesting that case presents "a standard example of monopoly pricing").

[19] Nor does the ABA represent the kind of coerced membership situation that raises constitutional concerns and a need for judicial solicitude for a member who disagrees with the organization. Cf. *Teachers* v. *Hudson*, 475 U. S. 292 (1986) (First Amendment rights of nonunion worker when union seeks agency fee as the exclusive bargaining representative).

an economic expense but one for the good of the profession, and for the greater good of society, that it would not exist, it could not have existed, it could not have survived, it would not have survived to today. And at least on the basis of this record those are my findings on that point." App. 505.

See also 4 Cl. Ct. 404, 405, n. 1 (1984) (incorporating oral findings of fact).

I believe that we are bound by that finding. The Court's suggestion to the contrary notwithstanding,[20] rejecting that finding would run afoul of the "two court rule,"[21] would decide the case on a ground expressly disavowed by the Government, and would conflict with the record. That finding, combined with the other findings and with a proper analysis of the purpose and scope of the unrelated business tax, requires a conclusion that the ABE has been operated as a charitable fundraising effort, rather than as a commercial business.

### III

The ABE's program poses no harm to competitors and has been operated as a charitable fundraising activity. Depending on its members' agreement to assign their dividends, it is far less like the operation of a competitive macaroni company than like the provision of insurance as a service with a request for the dividends. In my opinion, the Court of Appeals and the Chief Judge of the Claims Court were both quite correct in concluding that, on the basis of the record

[20] See also *ante*, at 116 ("Even if we assumed . . . that the court's failure to attach the label 'trade or business' to ABE's insurance program constitutes a finding of fact, we would be constrained to hold that finding clearly erroneous").

[21] See *Graver Tank & Mfg. Co.* v. *Linde Air Products Co.*, 336 U. S. 271, 275 (1949) ("A court of law, such as this Court is, rather than a court for correction of errors in fact finding, cannot undertake to review concurrent findings of fact by two courts below in the absence of a very obvious and exceptional showing of error").

generated at the vigorously contested trial, the tax that the Government seeks to collect in this case was not the kind of tax that Congress intended to impose.[22]  Accordingly, I respectfully dissent.

---

[22] In my opinion, moreover, the charitable character of the dividend assignment requires that the assignment be deductible for the individuals at the time the policy is purchased or renewed just as it would, in the Government's example, at the time the dividend was received and assigned.