**UNITED STATES of America**

v.

**WINDSOR CAPITAL CORP.**

No. 06–MBD–10475–RCL.

United States District Court,
D. Massachusetts.

Aug. 16, 2007.

---

Barbara Healy Smith, United States Attorney's Office, Boston, MA, Nathaniel J. Dorfman, U.S. Department of Justice, Tax Division, Washington, DC, for United States of America.

Paul F. Ware, David R. Zipps, Kenneth A. Cohen, Goodwin Procter LLP, Boston, MA, for Windsor Capital Corp.

## ORDER ON PETITION TO ENFORCE INTERNAL REVENUE SERVICE SUMMONS

LEO T. SOROKIN, United States Magistrate Judge.

Before the Court is the United States' petition to enforce an Internal Revenue Service ("IRS") summons, and respondent Windsor Capital Corporation's ("Windsor Capital") opposition thereto. The Court's Order of May 24, 2007 (Docket # 24), which describes the factual context out of which this dispute arose and explains the legal standards governing the Court's review of the United States' petition, is incorporated herein and will not be restated. In response to the Order, Windsor Capital submitted all of the documents in dispute for *in camera* review. After a second hearing, review of the Parties' briefs, and an *in camera* examination of all of the documents submitted by Windsor Capital, the petition is *DENIED*. As noted in the Court's prior Order, the United States bears a greater burden to obtain the otherwise privileged documents than to obtain the earlier ordered *in camera* review.

■■■ The Court finds that the United States has not met its burden of proof in this case to pierce the asserted privileges. The United States invokes the crime fraud exception to the privileges and advances only two theories of fraud.[1] Each is discussed below.

---

1. Under the Internal Revenue Code, a taxpayer can be held liable for civil tax fraud where

### 1. The Circular Flow Theory of Fraud

[5, 6] Certain Wallace Family trusts donated property worth $18.5 million to the Wallace Foundation which in turn sold the property and donated the $18.5 million in cash to The Nature Conservancy ("TNC"). The TNC then added the $18.5 million to the $45.5 million it already had from other unrelated sources in order to buy the Farm from other Wallace Family entities for a purchase price of $64 million. The government says that the Wallace Family members knew the $18.5 million donation was going to be returned to entities benefitting them and that therefore the structure of the transaction violated the familiar principle that a "payment of money generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return." *United States v. American Bar Endowment*, 477 U.S. 105, 117, 106 S.Ct. 2426, 91 L.Ed.2d 89 (1986). In essence, the government argues that the $18.5 million was funneled back to the Wallace Family in the form of the increased purchase price.

The taxpayers donating the $18.5 million, namely six family trusts benefitting Neil and Monte Wallace's six children, gave up $18.5 million in value and these taxpaying trusts received nothing in return. The TNC paid $18.5 million more for the Farm because of the contribution, a benefit received both by six *other* family trusts benefitting these same six children and, to a smaller degree, Neil and Monte Wallace personally. Looking beyond the legal formalities of the transaction reveals that the six children benefitted both from the $18.5 million contribution deduction and from the resulting increased purchase price paid by TNC. (Presumably the children, in the form of their taxpaying trusts, also bore the burden of the larger capital gains associated with a sale price increased by $18.5 million although the parties have not discussed that). Another significant fact is plain—the Wallace Family intended to donate $32.5 million in value to TNC and did so. No deduction was claimed for value not given by the Wallace Family to TNC (assuming for these purposes that the $78 million appraisal is valid).

As the government points out, the Wallace family retained two Boston law firms, Bingham Dana LLP (now Bingham McCutchen LLP) and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo P.C, to help "craft" the transaction. The undisputed evidence establishes that members of these law firms were involved in negotiating and structuring all aspects of the sale. The complexity of the transaction—the numerous entities involved, together with the numerous steps utilized to complete the transaction—certainly reflects creativity

---

he intended to evade taxes that he knew "or believed to be owing." *Stoltzfus v. United States*, 398 F.2d 1002, 1004 (3rd Cir.1968), *Mitchell v. C.I.R.*, 118 F.2d 308, 310 (5th Cir.1941). "In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary." 26 U.S.C. § 7454(a).

Of course, an attorney need not know about, or be complicit in, the alleged fraudulent activity. It is the *client's* behavior that is the focus of the inquiry. *United States v. Reeder*, 170 F.3d 93, 106 (1st Cir.1999). In addition, the exception applies not only where the client actually knows that the contemplated activity is illegal, but also where the client reasonably should have known. *United States v. Rakes*, 136 F.3d 1, 4 (1st Cir.1998). In order to pierce the attorney client/work product doctrine privileges, the government need not actually *prove* that the taxpayer committed fraud. Rather, the First Circuit instructs that the government must demonstrate that there is "a *reasonable basis* to believe that the lawyer's services were used by the client to foster a crime or fraud." *In re Grand Jury Proceedings*, 417 F.3d 18, 23 (1st Cir.2005)(emphasis added).

on the part of the Wallace family's tax attorneys, but neither the complexity nor the deep involvement of counsel are indicative of fraud in this case.

Moreover, the record establishes that lawyers, not the Wallaces, conceived of the circular structure of the transaction, no doubt in an effort to maximize the tax benefits. *See* Mockus Declaration, at ¶ 72 (stating that structure of the transactions "represents the most tax-beneficial allocation of the $32.5 million charitable contribution deduction across the various Wallace Family entities").

The Court has reviewed the privileged documents *in camera.* The documents reveal that counsel and the client(s) endeavored to develop an admittedly complicated financial transaction over a substantial period of time in light of various (and changing) business and tax considerations. There is not an indication that the Wallaces acted with an intent to evade taxes, rather the documents indicate they intended to maximize profit and minimize taxes within the bounds of the applicable laws, albeit by taking aggressive positions in a transaction the structure of which was conceived and directed by lawyers.

Whether or not the deduction will ultimately be determined to be proper as a matter of tax law (a question which is not before me, but which is presently pending before the United States Tax Court), in light of the foregoing the government has nevertheless failed to satisfy its burden of proof in this proceeding. Accordingly, the petition is *DENIED* on the circular flow theory of fraud.

2. Appraisal Theory of Fraud

■ The government also argues that the Wallace family's instruction to the appraiser, Coleman, to disregard the preemptive purchase rights caused Coleman to substantially overvalue the Farm.

According to the government, the Wallace family knew that the preemptive rights were a valid encumbrance on the property and that they had a negative effect on the fair market value of the Farm. The government's theory is that because TNC was only committed to pay $45.5 million out of pocket, the inflated $78 million appraisal of the Farm allowed various family members and entities to report "contributions" to which they would not otherwise be entitled: the $14 million bargain sale charitable donation, and the $18.5 million charitable contribution.

In tax returns filed with the IRS, the owners of Windsor Capital and the Sliver, Beach, and Blue Heron parcels, and Real Estate Equities, L.P. and its partners, represented that the $78 million was a qualified appraisal within the meaning of the Treasury Regulations, which provide that

[a] qualified appraisal shall include [*inter alia*] the following information ... (D) The terms of any agreement or understanding entered into (or expected to be entered into) by or on behalf of the donor or donee that relates to the use, sale, or other disposition of the property contributed, including, for example, the terms of any agreement or understanding that—(1) Restricts temporarily or permanently a donee's right to use or dispose of the donated property,(2) Reserves to, or confers upon, anyone (other than a donee organization or an organization participating with a donee organization in cooperative fundraising) any right to the income from the contributed property or to the possession of the property, including the right to vote donated securities, to acquire the property by purchase or otherwise, or to designate the person having such income, possession, or right to acquire ...

26 C.F.R. § 1.170A–13(c)(3)(ii).

For purposes of determining the amount of a charitable deduction, the Code further provides that if a charitable contribution is made in property other than money, the amount of the charitable deduction is the fair market value of the property at the time of the contribution. The fair market value is the price at which property would change hands between a willing buyer and willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Treasury Regulations on Income Tax (1954 Code) (26 C.F.R.), 1.170A–1(c). According to the government, the family misrepresented that the appraisal was for the fair market value of the Farm, and that they had no "knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property." 26 C.F.R. § 1.170A–13(c)(5)(ii).

Pursuant to a written agreement, the majority of the Farm's acreage was subject to preemptive purchase rights held by the family that sold the land to the Wallaces in 1969. The appraisal did not consider the potential effect of this contractual right on the value of the property; the Wallaces instructed the appraiser to consider the preemptive purchase rights "waived," an assumption specifically noted in the written appraisal at page 7.[2] The sale agreement between Windsor Capital and TNC provided, as a condition precedent to the closing, that the preemptive purchase rights would be "extinguished." Mockus Declaration Ex. 18, at 3.1(e). Fulfilling this condition prior to closing was TNC's sole responsibility under the con-

tract. Other evidence suggests that the condition was fulfilled later than agreed. The undisputed declaration from the IRS revenue agent states that, in fact, the rights were extinguished after the closing. Mockus Declaration at ¶ 84. At the further hearing held on the petition, counsel for the government stated that he thought that the closing and waiver occurred simultaneously, an assertion defense counsel did not dispute. Of course, there is no doubt that the holders of the preemptive purchase rights did not exercise their rights to purchase the Farm. That non-action necessarily occurred prior to the sale/donation of the land to TNC.[3]

The government argues that disregarding the preemptive purchase rights in the appraisal fraudulently inflated the value of the Farm. But the only cases the government cites, *Great Northern Nekoosa v. United States,* 711 F.2d 473, 475 (1st Cir. 1983) and *McMurray v. Commissioner,* 985 F.2d 36, 41 (1st Cir.1993), involved encumbrances on the land that restricted or limited the *buyer's* use of the land. Here, the preemptive purchase rights did not limit the buyer TNC's use of the land in any way.

Even as the preemptive purchases held by the sellers were described by the government, the rights restricted only the Wallaces: In a 1969 Agreement *"Monte Wallace and Neil Wallace agreed* not to sell, transfer or convey any part of the Herring Creek Farm to an unrelated party without first offering to sell the same part of Herring Creek Farm to the Sellers (or their descendants) at a predetermined per-

---

**2.** The reference was opaque; it referenced the 1969 Agreement, but the appraisal neither summarized nor attached the relevant portion of the 1969 Agreement.

**3.** Although the preemptive purchase rights may not have been extinguished or waived until after the transfer of the land to TNC, the

holders of these rights did not exercise their rights prior to the sale of the land to TNC, thereby allowing the sale to go forward. This non-exercise of the rights effectively extinguished them, since the rights did not run with the land. *See* discussion, *infra.*

acre purchase price" plus the fair market value of any structures. Mockus Declaration at ¶ 35 (Docket # 2)(emphasis added).[4] The 1969 Agreement also provides that the "provisions of this Agreement shall run with the land except where they are stated to be personal in nature." 1969 Agreement at ¶ 5(h) pg. 6, Ex. 5 to Mockus Declaration.

The government does not stand alone in describing the rights as personal in nature. In prior litigation cited extensively by the government, the Commonwealth's courts determined, and this Court agrees, that the preemptive purchase rights created in this 1969 Agreement were personal in nature, as opposed to running with the land. In litigation between the Wallaces and the holders of the preemptive purchase rights, the Superior Court declared:

> The right of first refusal is not a 'restriction on the use of land.' See *Labounty v. Vickers*, 352 Mass. 337, 347, 225 N.E.2d 333 (1967)(" 'restriction of the use of land' is a right to compel the person entitled to possession not to use it in specified ways"); *Myers v. Salin*, 13 Mass.App.Ct. 127, 133–34, 431 N.E.2d 233 (1982). Nor does the right of first refusal "run with the land." A covenant runs with the land when its benefit or obligation passes with ownership of the land irrespective of the consent of the subsequent parties. *See* 21 C.J.S., Covenants 25 (1990); *Howard J. Alperin & Lawrence D. Shubow*, Summary of Basic Law 17.83, at 659 (1996); *see generally Gallison v. Downing*, 244 Mass. 33, 36,

138 N.E. 315 (1923) (covenant that did not run with land could not be enforced by subsequent grantee). The right of first refusal, by the plain terms of the [1969] agreement, benefits only specified people, identified by name or by relationship to those named, and only so long as those people remain owners of abutting land containing dwelling houses; it grants no rights to, and imposes no burdens on, anyone else who might come to own the land. The catch-all language contained in the second to last paragraph of the agreement, stating that "the provisions of this Agreement shall run with the land except where they are stated to be personal in nature ..." cannot trump the plain meaning of the provision in issue.

*Johnson v. Cohan*, 11 Mass. L. Rep. 421, 2000 WL 282594, *8, 2000 Mass.Super. LEXIS 45 at *25–26 (2000). The government has cited this Superior Court litigation upholding the validity of the right of first refusal as evidence that Windsor Capital was on notice of the vitality of the agreement and the need to account for its value in the appraisal, however the language above also meaningfully distinguishes the present case from the two federal decisions cited by the government involving encumbrances on the land.

Thus, the government's two cases do not establish a reasonable basis to conclude that assuming the rights of first refusal were waived, for purposes of a valuation of the property at the time of the donation, was a fraudulent effort to evade taxes.

---

**4.** The relevant text of the 1969 agreement states: "the parties hereto hereby agree that until January 1, 2010, ... the Trustee [of the trust holding the land for the Wallaces] and the Wallaces will not sell, transfer or convey any part of the Trustee's land [other than to Neil or Monte Wallace or their spouses or descendants] without first offering to sell the same to such one or all of a group consisting of" the sellers or their descendants. 1969 Agreement at 4–5, Exhibit 5 to Mockus Declaration. The agreement goes on to establish the offering procedures and, in the event the sellers did not exercise their right of first refusal, provides the Wallaces forty-five days thereafter to sell the property on whatever terms they arrange. *Id.* at 5–6.

This is especially so in light of the personal nature of the preemptive rights, the focus of the appraisal on the time of contribution and the court's in camera review of the privileged documents. The privileged documents do not contain evidence supporting the government's theory of fraud in the appraisal.

Accordingly, the government has not met its burden of proof on its appraisal theory of fraud and the petition is *DE-NIED* as to this theory.

### 3. Challenges to the Assertions of Privilege

Finally, the government argues that even if the crime fraud exception does not apply, seventeen of the documents listed in the summons are excepted from a valid claim of privilege because they implicate Stuart Johnson. Johnson was in-house counsel, vice president, and/or trustee of many of the entities controlled by the Wallace family. The government argues that although Johnson is an attorney, Windsor Capital has not demonstrated that he was acting in his capacity as an attorney, or gave any legal advice in connection with, the documents at issue.

 The attorney-client privilege "extends to all communications made to an attorney or counsellor, duly qualified and authorized as such, and applied to by the party in that capacity, with a view to obtain his advice and opinions in matters of law, in relation to his legal rights, duties, and obligations." *F.D.I.C. v. Ogden Corp.*, 202 F.3d 454, 461 (1st Cir.2000) (citation omitted). As the party asserting the privilege, Windsor Capital bears the burden of demonstrating its applicability to the documents at issue. *See Town of Norfolk v. U.S. Army Corps of Engineers*, 968 F.2d 1438, 1457 (1st Cir.1992). The attorney-client privilege protects communications between corporate officers and in-house

counsel. *See Upjohn Co. v. United States*, 449 U.S. at 389–90, 101 S.Ct. 677. However, the privilege does not apply when in-house counsel is engaged in "nonlegal work." *Burlington Industries v. Exxon Corporation*, 65 F.R.D. 26, 33 (D.Md.1974). "[A]n in-house lawyer may wear several other hats (e.g., business advisor, financial consultant) and because the distinctions are often hard to draw, the invocation of the attorney-client privilege may be questionable in many instances." *City of Springfield*, 196 F.R.D. at 9. Courts have held that "nonlegal work" includes the rendering of business or technical advice unrelated to any legal issues. *Pacamor Bearings, Inc. v. Minebea Co., Ltd.*, 918 F.Supp. 491, 510–511 (D.N.H.1996). "A document must have been intended to be confidential and made for the purpose of giving or obtaining legal advice to be vested with the attorney-client privilege. Moreover, so long as the communication is primarily or predominantly of a legal character, the privilege is not merely lost by reason of the fact that it also dealt with nonlegal matters." *City of Springfield*, 196 F.R.D. at 9 (citation and quotation marks omitted).

For the attorney-client privilege, Windsor Capital must demonstrate that Johnson was acting as an attorney in relation to each of the documents at issue. "Merely saying that he was so acting in a memorandum of law is patently insufficient to meet the burden. Neither can it be assumed." *Borase v. M/A COM, Inc.*, 171 F.R.D. 10, 14 (D.Mass.1997).

Windsor Capital has also asserted the work product privilege. The work product doctrine was first recognized by the United States Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The Court noted that in performing his or her duties, it is essential that an attorney work with a certain de-

gree of privacy and free from unnecessary intrusion by opposing parties and their counsel. *Id.*, at 510, 67 S.Ct. 385. "Proper preparation of a client's case demands that [the attorney] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." *Id.*, at 511, 67 S.Ct. 385. Such attorney work product is reflected in "interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways." *Id.* Subsequently, the work product doctrine was codified by Fed.R.Civ.P. 26(b)(3), which permits the discovery of otherwise relevant materials which have been

> "... prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means."

▪ The work product privilege applies here. The planning and structuring of this transaction was performed in anticipation of litigation. At least one of the privileged documents specifically references anticipated litigation in that it seeks advice regarding the likely outcome in a Tax Court proceeding of various possible positions. In light of the size of the donation and deductions as well as the nature of the transactions, an audit and subsequent Tax Court proceedings were reasonably anticipated.

The court has reviewed the description of each of the documents listed in the privilege log, the sworn declarations of Johnson and Karen Stratton, Vice President and Director of Tax for GID, and the parties' reasoning in support of, and in opposition to, the production thereof. The following documents are protected because they consist of either (1) in-house counsel's communications with outside counsel, pertaining to legal issues; (2) in-house counsel's communication with the client about legal issues or (3) protected work product:

Bates # 013223, 16278; 016412, 016420, EDOC000322, 01537, 020116, 029421, EML000789,[5] June 1 2001 Richards Documents, Undated Johnson Document # 2.

Windsor Capital must produce the remaining documents as they are not privileged: EML000373, EML000429, Undated Johnson Document # 1,[6] 028988.

## CONCLUSION

For the foregoing reasons, the petition is DENIED except that Windsor Capital shall produce to the Petitioner, by August 23, 2007, the documents bearing Bates Numbers EML000373, EML000429, Undated Johnson Document # 1, 028988.

SO ORDERED.

---

5. I note that the parties description of this document is inaccurate. The Court's copy is an email from Attorney Milton dated January 18, 2001 at 5:39 p.m. It is a privileged communication, although it appears to be a copy of a document previously produced. Dorfman Declaration Ex. 18.

6. Respondent pressed a claim for privilege necessitating briefing and consideration by the Court regarding a piece of blank Johnson stationary attached to a produced document. The document is nothing more than a piece of his stationary.