T.C. Memo. 2000-175

UNITED STATES TAX COURT

ROBERT E. SIGNOM, II AND LOLA SIGNOM, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14764-98.                          Filed May 26, 2000.

Mark S. Feuer, for petitioners.

Stephen J. Neubeck, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge:  Respondent determined for 1991 a deficiency
in, an addition under section 6651(a)(1)[1] to, and an accuracy-
related penalty under section 6662(a) on petitioners' Federal
income tax (tax) in the amounts of $51,576, $12,894, and $10,315,

_____

[1]All section references are to the Internal Revenue Code in
effect for the year at issue.  All Rule references are to the Tax
Court Rules of Practice and Procedure.

respectively.

The issues remaining for decision for the year at issue are:[2]

(1) Are petitioners entitled to a deduction under section 170(a) for a claimed noncash charitable contribution?  We hold that they are not.

(2) Are petitioners liable for the accuracy-related penalty under section 6662(a)?  We hold that they are.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners resided in Dayton, Ohio (Dayton), at the time the petition was filed.

Petitioner Robert E. Signom, II (Mr. Signom) received an undergraduate degree in business administration in 1967 from Miami University of Ohio.  Thereafter, he attended law school, having matriculated for two years at Washington University in St. Louis and for one year at Ohio State University, from which he received a law degree in 1970.  Petitioner Lola Signom (Ms. Signom) received an undergraduate degree in journalism from Ohio University.

_____

[2]Petitioners conceded certain determinations in the notice of deficiency (notice) and did not present evidence at trial or make any argument on brief with respect to certain other determinations in the notice.  We conclude that petitioners have abandoned contesting those determinations in the notice as to which they presented no evidence at trial or make no argument on brief. See Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988).

Mr. Signom began practicing law in 1971. During the year at issue, he practiced law both as a partner with the law firm of Young, Pryor, Lynn & Jerardi and as a sole practitioner. At all relevant times, Mr. Signom, a collector of Packard automobiles, also operated a sole proprietorship that restored automobiles, and Ms. Signom was employed by NCR Corporation.

As of the time of the trial in this case, Mr. Signom served in a variety of positions for certain organizations, including as a trustee of the Wright State University Foundation, general counsel of the Hipple Cancer Research Laboratory, a member of the executive committee of the Miami Valley Council of the Boy Scouts of America, and a trustee of a museum devoted to Packard automobiles that he founded in Dayton (Packard museum). Mr. Signom had also served prior to the time of the trial in this case as a trustee and general counsel of the Miami Valley School located in Dayton. As of the time of that trial, Ms. Signom was involved with a number of organizations, including Westminster Presbyterian Church, the National Conference for Community and Justice, the Ohio University Development Foundation, and a hate crimes task force in Dayton.

Since 1975 to the time of the trial in this case, Mr. Signom owned interests in approximately 20 residential and commercial rental properties. Mr. Signom purchased one of those properties, which was located at 517 Irving Avenue, Dayton (Irving property), around 1976. That property contained a 6,600 square-foot build-

ing, which served as commercial storage garages.

On July 10, 1984, Marvin A. Mumma (Mr. Mumma) agreed to lease certain property that he owned, which was located on North St. Clair Street, Dayton (St. Clair property), to Mr. Signom and Malcom W. MacLeod (Mr. MacLeod) (Mumma/Signom/MacLeod lease). The Mumma/Signom/MacLeod lease was for a one-year term that commenced on August 15, 1984. If certain conditions stated in that lease were satisfied, it was automatically renewable for a total of four additional years.

On March 16, 1987, after Mr. MacLeod moved away from Dayton, Mr. Mumma and MHR Properties, which at all relevant times was an Ohio general partnership in which both Mr. Signom and Ms. Signom were equal general partners, entered into a written lease agreement with respect to the St. Clair property. (We shall refer to that written lease agreement as the Mumma/MHR Properties lease agreement.) Pursuant to the Mumma/MHR Properties lease agreement, Mr. Mumma agreed to lease the St. Clair property to MHR Properties for a 10-year term that commenced on March 1, 1987, in return for monthly rental payments of $1,000. (We shall refer to MHR Properties' right under the Mumma/MHR Properties lease agreement to lease the St. Clair property as MHR Properties' leasehold interest.) The Mumma/MHR Properties lease agreement did not permit MHR Properties, the lessee, to terminate MHR Properties' leasehold interest unilaterally.

Pursuant to the Mumma/MHR Properties lease agreement, Mr.

Mumma also agreed to give MHR Properties an option to purchase the St. Clair property. In this regard, that agreement provided:

### ARTICLE 19. PURCHASE OPTION

The parties agree that the present value of the property is $135,000. During the term of this Lease Tenant shall have the right to, at its sole option, purchase the property from Landlord for $135,000, which price shall be reduced by one-half (½) of all rents paid by Tenant to Landlord from the inception of this Lease to the time of purchase.

(We shall refer to the purchase option granted by Mr. Mumma to MHR Properties in the Mumma/MHR Properties lease agreement as MHR Properties' purchase option.) After MHR Properties paid the July 1991 rent due under the Mumma/MHR Properties lease agreement, it could have exercised MHR Properties' purchase option for $108,500, which was calculated under that lease agreement by reducing $135,000 (the value according to the Mumma/MHR Properties lease agreement of the St. Clair property as of March 16, 1987) by $26,500 (one-half of the rental payments through July 1991 that MHR Properties had made to Mr. Mumma under that lease agreement). (We shall sometimes refer collectively to MHR Properties' leasehold interest and MHR Properties' purchase option as MHR Properties' St. Clair property interests.)

Sometime after Mr. Mumma and MHR Properties entered into the Mumma/MHR Properties lease agreement, Mr. Mumma died. On May 23, 1988, Mr. Mumma's widow, Retha Mumma (Ms. Mumma), transferred by quitclaim deed the St. Clair property, which was subject to the Mumma/MHR Properties lease agreement, to the University of Dayton

(the University), an Ohio not-for-profit corporation. (We shall sometimes refer to the St. Clair property as encumbered by MHR Properties' St. Clair property interests as the encumbered St. Clair property.) Although the University accepted the gift of the encumbered St. Clair property from Ms. Mumma, the University desired to dispose of that property. That was because at the time Ms. Mumma transferred the encumbered St. Clair property to the University, that property was not contiguous to the University, and it was the University's general practice at that time to own only those real properties that were contiguous to it.

The University believed that it would be unable to dispose of the encumbered St. Clair property as long as MHR Properties' St. Clair property interests remained in effect. Consequently, in 1988, shortly after having received the encumbered St. Clair property from Ms. Mumma, the University contacted Mr. Richard Packard (Mr. Packard). Mr. Packard was a partner with the law firm of Porter, Wright, Morris & Arthur, who served as outside counsel for the University and who knew Mr. Signom, since they had worked together in the past and Mr. Packard had previously solicited Mr. Signom to become a substantial benefactor of the University, which Mr. Signom declined to do. The University asked Mr. Packard, who was not an officer of the University, as well as certain of its Board members and officers, to represent the University in dealing with Mr. Signom regarding its desire to dispose of the encumbered St. Clair property. (We shall refer to

the various individuals who represented the University with respect to its desire to dispose of the encumbered St. Clair property as representatives of the University.)

In their dealings with Mr. Signom regarding the University's desire to dispose of the encumbered St. Clair property, the representatives of the University asked Mr. Signom to consider, inter alia, the following proposals:  (1) Sale by the University to Mr. Signom of its fee interest in that property, (2) purchase by the University of MHR Properties' St. Clair property interests, or (3) gift to the University of MHR Properties' St. Clair property interests.  Mr. Signom advised the representatives of the University that he was willing to consider the foregoing proposals, but that he had to discuss those proposals with Ms. Signom and obtain her agreement in order to effect any such proposal because MHR Properties, a partnership in which he and Ms. Signom were equal general partners, held MHR Properties' St. Clair property interests.

No agreement was reached during the period 1988-1990 between the University and petitioners on how to accomplish the University's goal of disposing of the encumbered St. Clair property. Nonetheless, the representatives of the University continued to explore with Mr. Signom and others, including an attorney named Marvin Felman (Mr. Felman), how to accomplish that objective.

Sometime prior to May 1991, certain representatives of the University and Mr. Signom became aware that Mr. Felman had a

longstanding interest in acquiring the St. Clair property. That was because Mr. Felman owned a number of other real properties that were contiguous to that property, and he desired to combine the real properties that he already owned with the St. Clair property in order to create one large real estate tract.

Sometime prior to May 1991, certain representatives of the University and Mr. Felman became aware that Mr. Signom owned the Irving property, and Mr. Felman and Mr. Signom became aware that the University was interested in acquiring that property. The University was interested in acquiring the Irving property because it believed that the storage garages located thereon would satisfy its need for storage facilities in the neighborhood surrounding that property and because the University had identified the Irving property, as well as certain other real properties surrounding the University's campus, as properties that it wished to acquire as part of the University's long-range development plan.

Sometime prior to May 1991, certain representatives of the University and Mr. Felman also became aware that Mr. Signom had an interest in acquiring certain real property located at 420 South Ludlow Street, Dayton (Ludlow property), which was the current site of the Packard museum and the former site of a Packard automobile dealership.

Sometime prior to May 1991, Mr. Packard on behalf of the University, Mr. Signom, and Mr. Felman became the architects of a

proposed exchange transaction among the University, Mr. Signom, and Mr. Felman (proposed exchange transaction), whereby (1) the University would accomplish its objectives of disposing of the St. Clair property and acquiring the Irving property; (2) Mr. Signom would accomplish his objective of acquiring the Ludlow property; and (3) Mr. Felman would accomplish his objective of acquiring the St. Clair property. Each of the parties to the proposed exchange transaction had a specific condition or preference regarding how best to achieve such party's objective of acquiring and/or disposing of a particular real property, which the representatives of the University, Mr. Signom, and Mr. Felman made known during the negotiations regarding that transaction.

The University indicated during the negotiations regarding the proposed exchange transaction that it wanted to place certain deed restrictions on the Ludlow property. That was because it wanted to ensure that that property was not used for any purpose which was incompatible with the purposes of (1) the University, a Catholic university operated by the Marist religious order, and (2) Chaminade-Julienne High School, a Catholic high school also operated by the Marist religious order, that was closely aligned with the University and was located directly across the street from it.

Mr. Signom indicated during the negotiations regarding the proposed exchange transaction that he wanted to treat the proposed termination of MHR Properties' St. Clair property interests

as a gift to the University for tax purposes.

Mr. Felman made it known during the negotiations regarding the proposed exchange transaction that he was unwilling to purchase the St. Clair property unless MHR Properties' purchase option with respect to that property was extinguished. Mr. Felman further stated during those negotiations that he preferred that MHR Properties' leasehold interest with respect to the St. Clair property be terminated before he purchased that property. However, Mr. Felman indicated that if no agreement regarding cancellation of that leasehold interest could be reached, he would attempt to negotiate an agreement with Mr. Signom regarding, inter alia, the length of the lease term under the Mumma/MHR Properties lease agreement.

By around May 1991, the University, Mr. Signom, and Mr. Felman reached a tentative agreement on the following basic structure of the proposed exchange transaction (tentative exchange transaction) that would enable them to accomplish their respective objectives: (1) The termination of MHR Properties' St. Clair property interests by mutual agreement of the University and Mr. Signom and Ms. Signom as the general partners of MHR Properties and the transfer by the University to, and the purchase by, Mr. Felman of the St. Clair property unencumbered by those property interests; (2) the transfer by Mr. Signom to the University of the Irving property subject to the existing mortgage on that property; and (3) the acquisition by the University

of the Ludlow property and the transfer by the University to Mr. Signom of that property subject to deed restrictions placed thereon by the University.

In anticipation of finalizing and thereafter closing the tentative exchange transaction and in order to facilitate the acquisition by the University of the Ludlow property and its transfer by the University to Mr. Signom at that closing, Mr. Felman, who had no interest in acquiring the Ludlow property, signed a contract dated May 7, 1991, that he did not negotiate under which he offered to purchase that property from EDR Associates (EDR) (May 7 Ludlow contract).  Pursuant to the May 7 Ludlow contract, Mr. Felman offered to purchase the Ludlow property for $253,000 and made a $5,000-earnest money deposit.  Consistent with the tentative exchange transaction to which the University, Mr. Signom, and Mr. Felman had tentatively agreed (i.e., the University, and not Mr. Felman, would acquire the Ludlow property and transfer it to Mr. Signom), the May 7 Ludlow contract provided that, upon its closing, the deed transferring the Ludlow property was to be made to "H. MARVIN FELMAN OR HIS NOMINEE".  Although Mr. Felman's offer under the May 7 Ludlow contract was to remain open only until May 10, 1991, EDR made a counteroffer to the May 7 Ludlow contract that was signed by a representative of EDR on June 4, 1991 (June 4 Ludlow counteroffer).[3]  On June

---

[3]The modifications to the May 7 Ludlow contract contained in
(continued...)

21, 1991, Mr. Felman accepted the June 4 Ludlow counteroffer. (We shall refer to the contract that Mr. Felman and EDR entered into for the purchase of the Ludlow property from EDR as the Ludlow property purchase contract.)

In anticipation of finalizing and thereafter closing the tentative exchange transaction, by letter dated July 6, 1991 (July 6 letter), Mr. Signom sent Mr. Packard a document entitled "DEED OF GIFT", which also was dated July 6, 1991 (July 6 document). The July 6 letter stated in pertinent part:

> In re: Donation to University of Dayton
>
> Dear Dick:
>
> In our recent conversation about the above refer-enced matter, you suggested that I execute a "Deed of Gift" to the University covering my Purchase Option on the St. Clair Street property, effective immediately.
>
> Enclosed herewith, please find that Deed of Gift. It is my understanding that, if it meets with your approval, you will forward it to your client; if it does not, you will contact me with all deliberate speed with your suggested modifications.

The July 6 document, which related only to MHR Properties' purchase option and not to MHR Properties' leasehold interest, stated in pertinent part:

DEED OF GIFT

---

[3](...continued) the June 4 Ludlow counteroffer are not material to a resolution of the issue presented in this case under sec. 170.

For reasons not disclosed by the record, the June 4 Ludlow counteroffer was signed again by a representative of EDR on June 19, 1991.

Comes now Robert E. Signom II, residing at 1350 Creighton Avenue, City of Dayton, County of Montgomery, State of Ohio, and hereby makes a gift of the following:

The Purchase Option contained in Article 19 of that certain Agreement of Lease, by and between Marvin Mumma and MHR Properties, dated March 16, 1987, regarding the building located at 15-23 North St. Clair Street, City of Dayton, County of Montgomery, State of Ohio, and being Part Lot Number 140 of the revised plat of the City of Dayton.

to THE UNIVERSITY OF DAYTON, 300 College Park Avenue, City of Dayton, County of Montgomery, State of Ohio, as of this 6th day of July, 1991.

Mr. Signom was aware, and indeed had informed the representatives of the University in 1988, that he had to obtain the agreement of Ms. Signom in order to effect any proposal with respect to MHR Properties' leasehold interest or MHR Properties' purchase option. Nonetheless, the July 6 document stated that Mr. Signom, instead of MHR Properties and/or Mr. Signom and Ms. Signom as the equal general partners of that partnership, was the grantor to the University of MHR Properties' purchase option. In addition, Mr. Signom signed the July 6 document in his individual capacity and not as a general partner or otherwise as a representative of MHR Properties. The signature of Ms. Signom does not appear on the July 6 document. No other individual signed the July 6 document as a representative of MHR Properties. Although Mr. Signom sent the July 6 document to Mr. Packard, it was not sent to the University and was never recorded.

In anticipation of finalizing and thereafter closing the

tentative exchange transaction, on July 12, 1991, Mr. Signom sent a number of documents relating to that transaction by facsimile transmission to William Deas (Mr. Deas), an attorney at Porter, Wright, Morris & Arthur who was experienced in real estate matters and who was working with Mr. Packard on behalf of the University with respect to that transaction. Those documents consisted of a copy of a mortgage dated November 4, 1978, in an amount not exceeding $59,600 that secured the Irving property (Irving property mortgage), a partial release of that mortgage dated January 2, 1981, a site plan of the Irving property, and a draft of an agreement relating to the tentative exchange transaction (draft property exchange agreement).

The draft property exchange agreement provided in pertinent part:

THIS AGREEMENT, by and among the University of Dayton ("UNIVERSITY") * * *; H. Marvin Felman ("FELMAN") * * *; and Robert E. Signom II, and/or Robert E. Signom II dba MHR Properties * * * (collectively "SIGNOM"), entered into this _____ day of July, 1991.

WHEREAS, the UNIVERSITY is desirous of acquiring certain real property, commonly known as 517 Irving Avenue (rear), Dayton, * * * ("Irving") which is presently owned by SIGNOM, and

WHEREAS, FELMAN is desirous of acquiring certain real property, commonly known as 17-25 North St. Clair Street, Dayton, * * * ("St. Clair") which is presently owned by the UNIVERSITY, and leased to SIGNOM, and SIGNOM having an option to purchase said property as set out in said lease, and

WHEREAS, SIGNOM is desirous of acquiring certain real property, commonly known as 420 South Ludlow

Street * * * Dayton * * * ("Ludlow") which is presently under a contract to purchase by FELMAN.

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

1.  At a closing to be held on or before July __ 1991, at the office of _____, the parties hereto shall execute the following transfers:

A.  FELMAN shall purchase the St. Clair property from the UNIVERSITY for the sum of * * * $220,000.00 * * * and the UNIVERSITY shall then transfer to FELMAN, or his designee, by Limited Warranty Deed, the St. Clair property.  A cancellation of lease and cancellation of option to purchase shall be executed by SIGNOM and he shall obtain signatures from his wife and the partnership which has interest in said property on said document.  Furthermore, SIGNOM shall assign said tenants in possession's leases to FELMAN.

B.  FELMAN shall assign his contract to purchase the Ludlow Street property to the UNIVERSITY.  UNIVERSITY shall then complete the acquisition of said Ludlow Street property and transfer the same to SIGNOM, by General Warranty Deed together with a cash payment of * * * $10,500.00 * * * plus an amount equal to one-half * * * any and all payments made by SIGNOM to the UNIVERSITY with regard to the St. Clair property, from May 1, 1991, to and including the date of said closing.  The UNIVERSITY shall refund FELMAN's earnest money deposit for the Ludlow Street property in the amount of * * * $5,000 * * *.

C.  SIGNOM shall transfer to the UNIVERSITY, by General Warranty Deed, the Irving Street property, subject to the existing mortgage in favor of NBD in the amount of approximately * * * $31,564.01 * * *.  The UNIVERSITY shall refund to Signom at closing any amount by which that principal balance has been reduced from May 1, 1991 to and including the date of closing.

2.   All such transfers shall be made with a proration of real property taxes through and including the date of closing.  The transferor shall pay the county transfer tax of $2.00 per thousand on the sale price. * * *

\*          \*          \*          \*          \*          \*          \*

5.   Each transferor shall prepare, subject to the approval of the transferee, the documents of title for each transfer.

\*          \*          \*          \*          \*          \*          \*

7.   Each transferee shall receive possession at closing, subject only to tenants' rights, if any.

8.   During Signom's ownership of the Ludlow property, the University reserves and restricts the use of the Ludlow property prohibiting the use thereof for (1) the sale and/or distribution of pornographic materials; (2) nude and semi-nude entertainment; (3) abortion services; and/or (4) any other purpose reasonably found offensive by the University, and reasonably based upon its character as a Catholic-sponsored institution of higher education.  In the event the Grantee violates the foregoing restrictions, the University may reacquire the Ludlow property at two (2) time[s] its then appraised value.

These reservations and restrictions shall terminate and be of no force and effect upon the sale or exchange of the Ludlow property by Signom.

Certain changes not material to a resolution of the issue presented in this case under section 170 were made to the draft proposed property exchange agreement before it was finalized and signed (1) on August 1, 1991, by Mr. Deas on behalf of the University and by Mr. Signom and by Mr. Felman and (2) a few days thereafter by Brother Bernard J. Ploeger, S.M. (Brother Ploeger), the Senior Vice President for Administration of the University, on behalf of the University.

In anticipation of finalizing and thereafter closing the draft property exchange agreement, on July 22, 1991, Brother Ploeger signed (1) a limited warranty deed conveying the St. Clair property to Mr. Felman (July 22 St. Clair deed), (2) a limited warranty deed conveying the Ludlow property to Mr. Signom (July 22 Ludlow deed), and (3) a document entitled "CANCELLATION OF LEASE and OPTION TO PURCHASE" (July 22 document). After Brother Ploeger signed the foregoing documents, the University sent them to Mr. Packard and Mr. Deas to be held in their custody and to be used only in the event that the parties to the draft property exchange agreement finalized and thereafter closed that agreement. As of July 22, 1991, when Brother Ploeger signed the July 22 St. Clair deed, the July 22 Ludlow deed, and the July 22 document, the parties to the draft property exchange agreement anticipated that the various transactions provided for by that agreement would close on July 31, 1991 (July 31 anticipated closing), the date on which the Ludlow property purchase contract stated the closing for delivery of the deed for the Ludlow property and the payment of the balance of the purchase price for that property (collectively, closing of the purchase of the Ludlow property) were to take place.

The July 22 document that Brother Ploeger signed provided in pertinent part:

> THIS INDENTURE, made this 22 day of July, 1991.
>
> WHEREAS, it is mutually beneficial for the Univer-

> sity of Dayton, successor lessor to Marvin Mumma, Deceased, hereinafter referred to [as] Party of the 1st Part, and the Lessee, MHR, an Ohio General Partnership, and Robert Signom, married and General Partner, and his wife, Lola A. Signom, General Partner, being all of the partners of the MHR Partnership, hereinafter referred to [as] Party of [the] 2nd Part, to cancel an Agreement of Lease and Option to Purchase executed on the 16th day of March, 1987 between Party of the 1st Part and the Parties of the Second Part as per "Exhibit A" recorded at Microfiche No. 87-0548A01 of the Mortgage Records of Montgomery County, Ohio.

> \*      \*      \*      \*      \*      \*      \*

> WITNESSETH, that on the date hereof each of the parties has paid to the other the sum of ONE HUNDRED DOLLARS ($100.00) and each of them has cancelled, voided and delivered up to [sic] the agreement to lease and option to purchase as per "Exhibit A" which has been declared null and void and of no other effect.

At all relevant times, including when Brother Ploeger signed the July 22 document, the University was not known to have sued in order to enforce a promised gift to it.

The University, Mr. Signom, and Ms. Signom all anticipated that Mr. Signom and Ms. Signom would sign the July 22 document on behalf of MHR Properties at the July 31 anticipated closing. However, shortly after Brother Ploeger signed the July 22 document and sent it, along with the July 22 St. Clair deed and the July 22 Ludlow deed that he also signed on July 22, 1991, to Mr. Packard and Mr. Deas to be used in the event the draft property exchange agreement was finalized and a closing thereunder took place, Mr. Signom informed Mr. Deas that Ms. Signom would be unable to attend the July 31 anticipated closing. At Mr. Signom's request, Mr. Deas mailed the July 22 document to Mr.

Signom in order to have Ms. Signom sign it prior to that antici-
pated closing.  Mr. Deas expected Mr. Signom to have that docu-
ment signed by Ms. Signom and to bring it with him to the July 31
anticipated closing.  On July 26, 1991, both Mr. Signom and Ms.
Signom signed the July 22 document.

On August 1, 1991, the parties to the draft property ex-
change agreement finalized the terms of that agreement when Mr.
Signom, Mr. Felman, and Mr. Deas as the University's representa-
tive signed a document (final property exchange agreement) that
set forth the final terms of the various transactions that they
agreed would take place under that agreement (final exchange
transaction).  The closing of the final exchange transaction, as
well as the closing of the purchase of the Ludlow property, took
place on August 1, 1991 (August 1 closing), instead of on July
31, 1991, as originally contemplated.  Mr. Signom and Mr. Felman
attended the August 1 closing, as did Mr. Deas as the Univer-
sity's representative.  The July 22 document, as signed by
Brother Ploeger on behalf of the University on July 22, 1991, and
by petitioners as the general partners of MHR Properties on July
26, 1991, was delivered at the August 1 closing.  Brother Ploeger
executed the final property exchange agreement on behalf of the
University a few days after the August 1 closing.

As pertinent here, the terms of the final property exchange
agreement were identical to the terms of the draft property
exchange agreement.  The final property exchange agreement

provided in pertinent part:

<u>AGREEMENT</u>

THIS AGREEMENT, by and among the University of Dayton ("UNIVERSITY") * * *; H. Marvin Felman ("FELMAN") * * *; and Robert E. Signom II, and/or Robert E. Signom II dba MHR Properties * * * (collectively "SIGNOM"), entered into this <u>1st</u> day of August, 1991.

WHEREAS, the UNIVERSITY is desirous of acquiring certain real property, commonly known as 517 Irving Avenue (rear), Dayton * * * ("Irving") which is presently owned by SIGNOM, and

WHEREAS, FELMAN is desirous of acquiring certain real property, commonly known as 17-25 North St. Clair Street, Dayton * * * ("St. Clair") which is presently owned by the UNIVERSITY, and leased to SIGNOM, and SIGNOM having an option to purchase said property as set out in said lease, and

WHEREAS, SIGNOM is desirous of acquiring certain real property, commonly known as 420 South Ludlow Street and/or 41 Franklin Street, Dayton * * * ("Ludlow") which is presently under a contract to purchase by FELMAN.

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, the parties agree as follows:

1.   At a closing to be held on or before August <u>1st</u>, 1991, at the office of Lawyers Title Insurance Company, the parties hereto shall execute the following transfers:

A.   FELMAN shall purchase the St. Clair property from the UNIVERSITY for the sum of * * * $220,000.00 * * * and the UNIVERSITY shall then transfer to FELMAN, or his designee, by Limited Warranty Deed, the St. Clair property.  A cancellation of lease and cancellation of option to purchase shall be executed by SIGNOM and he shall obtain signatures from his wife and the partnership which has interest in said property on said document.  Furthermore, SIGNOM shall assign sub-

tenants in possession's leases to FELMAN.

B.    FELMAN shall assign his contract to purchase the Ludlow Street property to the UNIVERSITY.  UNIVERSITY shall then complete the acquisition of said Ludlow Street property and shall exchange the same with SIGNOM, by Limited Warranty Deed for the Irving Street property together with a cash payment of * * * $10,500.00 * * *, plus an amount equal to one-half * * * any and all payments made by SIGNOM to the UNIVERSITY with regard to the St. Clair property, from May 1, 1991, to an[d] including the date of said closing. The UNIVERSITY shall refund FELMAN's earnest money deposit for the Ludlow Street property in the amount of * * * $5,000 * * *.

C.    SIGNOM shall transfer to the UNIVERSITY, by General Warranty Deed, the Irving Street property, subject to the existing mortgage in favor of NBD in the amount of approximately * * * $31,515.96 * * *. The UNIVERSITY shall refund to SIGNOM at closing any amount by which that principal balance has been reduced from May 1, 1991 to and including the date of closing.

2.    All such transfers shall be made with a proration of real property taxes through and including the date of closing.  The transferor shall pay the county transfer tax of $2.00 per thousand on the sale price. * * *

*      *      *      *      *      *      *

5.    Each transferor shall prepare, subject to the approval of the transferee, the documents of title for each transfer.

*      *      *      *      *      *      *

7.    Each transferee shall receive possession at closing, subject only to tenants' rights, if any.

8.    During SIGNOM's ownership of the Ludlow property, the UNIVERSITY reserves and restricts the use of the Ludlow property prohibiting the use thereof for (1) the sale and/or distribution of pornographic materials; (2) nude and semi-nude entertainment; (3) abortion services; and/or (4) any

other purpose reasonably found offensive by the UNIVERSITY, and reasonably based upon its character as a Catholic-sponsored institution of higher education.  In the event Signom violates the foregoing restrictions designated as restrictions (1), (2) or (3), the University may reacquire the Property at its then appraised value.  In the event Signom violates the foregoing restriction designated as restriction (4), the University may reacquire the Property at two times its then appraised value.  Said appraisal to be based upon the highest and best use of the Property regardless of such restrictions.

The parties to the final property exchange agreement intended for (1) the July 22 St. Clair deed to satisfy the requirement in the final property exchange agreement that "the UNIVERSITY shall * * * transfer to FELMAN * * * by Limited Warranty Deed, the St. Clair property"; (2) the July 22 Ludlow deed to satisfy the requirement in the final property exchange agreement that the "UNIVERSITY * * * shall exchange * * * [the Ludlow property], by Limited Warranty Deed for the Irving Street property"; and (3) the July 22 document to satisfy the requirement in the final property exchange agreement that "A cancellation of lease and cancellation of option to purchase shall be executed by SIGNOM and he shall obtain signatures from his wife and the partnership which has interest in said property on said document".

Pursuant to the final property exchange agreement, as of August 1, 1991, (1) (a) MHR Properties, Mr. Signom and Ms. Signom, as the general partners of MHR Properties, and the University canceled, by delivery of the July 22 document that they had signed shortly before the August 1 closing, the

Mumma/MHR Properties lease agreement, including MHR Properties' purchase option contained in that agreement, (b) Mr. Felman purchased from the University the unencumbered St. Clair property, which had a value as of that date of $220,000 as set forth in the final property exchange agreement, and (c) the University conveyed that property to Mr. Felman by delivery of the July 22 St. Clair deed that the University had signed shortly before the August 1 closing; (2) (a) the University purchased from EDR the Ludlow property,[4] which had a value as of that date of $253,000 as set forth in the final property exchange agreement, and (b) the University conveyed that property to Mr. Signom by delivery of the July 22 Ludlow deed that the University had signed shortly before the August 1 closing; and (3) (a) Mr. Signom conveyed the Irving property subject to the Irving property mortgage, which had a $30,963 balance due as of that date, to the University by general warranty deed (Irving deed), and (b) the University paid Mr. Signom $12,000 in cash.[5]  (We shall refer to the transfers of properties and other consideration that were effected on August 1, 1991, among the University, Mr. Felman, and Mr. Signom as the August 1 property transfers.)  The

---

[4]The parties to the Ludlow property purchase contract had agreed to extend the date of closing of the purchase of the Ludlow property from July 31, 1991, to Aug. 1, 1991.

[5]The value of the Irving property that Mr. Signom transferred to the University pursuant to the final property exchange agreement on Aug. 1, 1991, was not set forth in that agreement.

University thus transferred to Mr. Signom as part of the August 1 property transfers a total of $295,963 consisting of property (the Ludlow property valued at $253,000 and $12,000 cash) and other consideration (relief from the mortgage of $30,963 to which the Irving property was subject on August 1, 1991, when Mr. Signom transferred it to the University).

On August 6, 1991, the Irving deed, the July 22 Ludlow deed, the July 22 St. Clair deed, and the July 22 document were recorded in Montgomery County, Ohio (Montgomery County).  In order to record those three deeds, the respective grantors or transferors of the real properties to which those deeds pertained and which were conveyed pursuant to the final property exchange agreement were required to pay (1) a real property transfer tax imposed by Montgomery County with respect to the respective transfers of those properties that in this case was equal to $1 for each $1,000 of the respective values of those properties, see Ohio Rev. Code Ann. sec. 322.02 (Anderson 1998); Montgomery County, Ohio, Resolution 80-2479 (Dec. 30, 1980); and (2) a fee imposed by Montgomery County with respect to the respective transfers of those properties that in this case was equal to $1 for each $1,000 of those respective values, see Ohio Rev. Code Ann. sec. 319.202(C) and 319.54(F)(3) (Anderson 1998).  (We shall refer collectively to that tax and fee as the Ohio transfer tax.) At all relevant times, under the law of the State of Ohio, the grantee or transferee of real property was required to declare

the value of real property transferred in order to calculate the Ohio transfer tax. See Ohio Rev. Code Ann. sec. 319.202 (Anderson 1998). The Ohio transfer tax imposed on the University with respect to its conveyance to Mr. Signom of the Ludlow property was $506, which means that Mr. Signom, as the grantee or transferee of that property, declared its value to be $253,000. The Ohio transfer tax imposed on the University with respect to its conveyance to Mr. Felman of the St. Clair property was $440, which means that Mr. Felman, as the grantee or transferee of that property, declared its value to be $220,000. The Ohio transfer tax imposed on Mr. Signom with respect to his conveyance to the University of the Irving property was $330, which means that the University, as the grantee or transferee of that property, declared its value to be $165,000.

Petitioners anticipated that Mr. Signom would receive quid pro quo from the University at the closing of the final exchange transaction on August 1, 1991. Under the final property exchange agreement, Mr. Signom was entitled to receive quid pro quo from the University in the final exchange transaction, and pursuant to that agreement he did receive such quid pro quo in that transaction.

On August 15, 1991, Mr. Deas sent a letter to Mr. Signom which transmitted to Mr. Signom for his review and approval a draft of a document entitled "AGREEMENT FOR CANCELLATION OF LEASE" (August 15 draft acknowledgment). The August 15 draft

acknowledgment provided in pertinent part:

This Agreement made effective as of August 1, 1991, by and between the University of Dayton, an Ohio corporation not-for-profit ("Landlord"), and MHR Properties, an Ohio general partnership, Robert E. Signom II and Lola A. Signom, Husband and Wife (collectively, the "Tenant").

WHEREAS, Marvin Mumma, as landlord, and MHR Property, as tenant, entered into a lease dated March 16, 1987, for the premises located at 15-23 N. St. Clair Street, Dayton, Ohio, which is more particularly described on Exhibit "A" attached hereto and made a part hereof, and is recorded at Microfiche No. 87-0548 A01 of the Mortgage Records for Montgomery County, Ohio ("Lease"); and

WHEREAS, the University of Dayton is the successor-in-interest to the interest of Marvin Mumma, as landlord, having acquired same pursuant to a deed recorded at Microfiche No. _____ of the Deed Records for Montgomery County, Ohio; and

WHEREAS, Robert E. Signom II and Lola A. Signom, are all of the general partners of MHR Properties; and

WHEREAS, said Lease provides as follows:

Article 19.  Purchase Option.

The parties agree that the present value of the property is $135,000.  During the term of this Lease Tenant shall have the right to, at its sole option, purchase the property from Landlord for $135,000, which price shall be reduced by one-half (½) of all rents paid by Tenant to Landlord from the inception of this Lease to the time of purchase.

WHEREAS, pursuant to the foregoing Article 19, effective on receipt of the July 1, 1991, rental payment, the then current option purchase price for the property subject of said Lease was $108,500;

WHEREAS, Landlord has entered into an Agreement for the sale of the property subject of said Lease in consideration of payment to the University from a third party purchaser in the amount of $220,000 which further

requires that the Tenant's Lease and purchase option be terminated and cancelled;

WHEREAS, the Tenant has agreed to terminate and cancel said Lease by a gift of their interest in the property to the Landlord.

Now, therefore, Landlord and Tenant hereby agree that Tenant shall gift to the Landlord its interest in said Lease and option to purchase pursuant to Article 19 thereof; and Landlord and Tenant shall execute and record the Cancellation of Lease and Option to Purchase attached hereto as Exhibit "B" to commemorate termination and cancellation of said Lease.

Sometime in 1991 or 1992, Mr. Signom and Ms. Signom, as the general partners of MHR Properties, signed a document entitled "AGREEMENT FOR CANCELLATION OF LEASE" that was virtually identical to the August 15 draft acknowledgment. Around August 1994, Mr. Signom sent that signed document to the University for signature by an appropriate officer of the University. After Brother Ploeger signed that document on behalf of the University, Mr. Deas returned it to Mr. Signom by letter dated August 10, 1994. (We shall refer to the document entitled "AGREEMENT FOR CANCELLATION OF LEASE" as signed by petitioners and by Brother Ploeger on behalf of the University as the final acknowledgment document.)

At a time that we are unable to find from the instant record, petitioners retained Martin Nizny (Mr. Nizny) to perform certain appraisal services. Mr. Nizny prepared a letter addressed to Mr. Signom as a partner of MHR Properties which he dated October 13, 1992 (Mr. Nizny's letter dated October 13,

1992) and which provided in pertinent part:

> The purpose of this appraisal, at your request, is to estimate the market value of the Option to Purchase under the Leasehold interest in the building at 15-23 North St. Clair Street, Dayton, Ohio.
>
>    \*       \*       \*       \*       \*       \*       \*
>
> After throughly analyzing the information gathered for this assignment, in particular, the verified arms-length transaction on the subject property that occurred on July 31, 1991, it is my opinion the value of the Option as of August 1, 1991 was $111,500.00.  This amount represents the difference between the Referenced sale at $220,000.000 and your then current option purchase price of $108,500.00.

Mr. Nizny prepared another letter addressed to Mr. Signom as a partner of MHR Properties which he dated August 2, 1994 (Mr. Nizny's letter dated August 2, 1994) and which provided in pertinent part:

> The purpose of this appraisal, at your request, is to estimate the market value of your Leasehold interest in the building at 15-23 North St. Clair Street, Dayton, Ohio.
>
> After thoroughly analyzing the information gathered for this assignment, in particular, the verified arms-length transaction on the subject property that occurred on July 31, 1991, it is my opinion the leasehold value as of August 1, 1991 was $111,500.00.  This amount represents the difference between the Referenced sale at $220,000.00 and your then current option purchase price of $108,500.00.

By invoice dated August 10, 1994, Mr. Nizny billed Mr. Signom $250 for his appraisal services.  Mr. Signom paid that invoice by check dated October 17, 1994.

On September 26, 1994, petitioners filed a joint Form 1040, U.S. Individual Income Tax Return, for 1991 (joint return).  The

date, including extensions, on which petitioners' joint return was due was October 15, 1992.

In their joint return, petitioners deducted $111,500 for a claimed noncash charitable contribution to the University. As required, petitioners filed Form 8283, Noncash Charitable Contributions (Form 8283), with their joint return. Petitioners completed section B, Appraisal Summary, of Form 8283 relating to a claimed charitable contribution deduction of more than $5,000 per item. Petitioners attached Mr. Nizny's letter dated October 13, 1992, and the final acknowledgment document to Form 8283. They did not attach any other documents to Form 8283 and did not otherwise disclose in their joint return all of the August 1 property transfers that were effected as of August 1, 1991, pursuant to the final property exchange agreement.

In Part I of Section B of Form 8283, entitled "Information on Donated Property", petitioners described the claimed donated property as "OPTION TO PURCHASE REAL ESTATE AT LESS THAN FAIR MARKET VALUE" and reported that its appraised fair market value was $111,500. Mr. Nizny signed the "Certification of Appraiser" in Part III of Section B of Form 8283. The date of the appraisal of the "OPTION TO PURCHASE REAL ESTATE AT LESS THAN FAIR MARKET VALUE" as reported in Part III of Section B of Form 8283 was October 13, 1992. Mr. Nizny's address as reported in Part III of Section B of Form 8283 was an address to which he moved after October 13, 1992.

Brother Ploeger signed on behalf of the University the "Donee Acknowledgment" in Part IV of Section B of Form 8283 and acknowledged therein that the University received the claimed donated property on August 1, 1991. Nowhere in their joint return did petitioners indicate that either MHR Properties' leasehold interest or MHR Properties' purchase option was terminated as of a date other than August 1, 1991. The date of Brother Ploeger's signature as reported in Part IV of Section B of Form 8283 was September 21, 1994.

In the notice issued to petitioners for 1991, respondent determined, inter alia, to disallow the $111,500 claimed noncash charitable contribution to the University. Respondent further determined in the notice that petitioners are liable for 1991 for the accuracy-related penalty under section 6662(a).

## OPINION

Petitioners bear the burden of proving that the determinations in the notice are erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

### Claimed Charitable Contribution Deduction

In their joint return and in the petition, petitioners claimed a charitable contribution deduction under section 170(a) with respect to MHR Properties' purchase option. However, petitioners argued at trial, and they argue on brief, that they are entitled to a charitable contribution deduction with respect to both MHR Properties' leasehold interest and MHR Properties'

purchase option.  We conclude that petitioners have abandoned the position in their joint return and in the petition.  See Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988).  We shall address petitioners' argument at trial and on brief that they are entitled to a charitable contribution deduction with respect to both MHR Properties' leasehold interest and MHR Properties' purchase option.

Section 170(a) generally allows a taxpayer a deduction for any charitable contribution, as defined in section 170(c), made during the taxable year.  Section 170(c) defines the term "charitable contribution" to mean a contribution or gift to or for the use of one or more specified organizations (qualified recipient).  The parties' initial dispute under section 170 is whether the cancellation of MHR Properties' St. Clair property interests constitutes a contribution or gift within the meaning of section 170(c).[6]  In resolving that dispute, we bear in mind that the sine qua non of a charitable contribution under section 170 is a transfer of money or property without adequate consideration.  See United States v. American Bar Endowment, 477 U.S. 105, 118 (1986).  In limiting a deduction under section 170(a) to a "contribution or gift" to or for the use of a qualified recipi-

---

[6]The parties also have a disagreement over whether petitioners substantially complied with certain of the recordkeeping and return requirements for charitable contribution deductions prescribed by sec. 170(a) and sec. 1.170A-13, Income Tax Regs. We address that disagreement infra note 12.

ent, "Congress intended to differentiate between unrequited payments to qualified recipients and payments made to such recipients in return for goods or services.  Only the former were deemed deductible."  Hernandez v. Commissioner, 490 U.S. 680, 690 (1989).  Congress also intended that a transfer of money or property to or for the use of a qualified recipient qualify as a contribution or gift for purposes of section 170 only if such transfer was made with no expectation of any quid pro quo from such recipient.  See Hernandez v. Commissioner, supra; see also Osborne v. Commissioner, 87 T.C. 575, 581 (1986); Rusoff v. Commissioner, 65 T.C. 459, 469 (1975), affd. without published opinion 556 F.2d 559 (2d Cir. 1977).  In determining whether the cancellation of MHR Properties' St. Clair property interests by petitioners, as the general partners of MHR Properties, was made with the expectation of any quid pro quo from the University, we shall focus on the external features relating to that cancella- tion.  See Hernandez v. Commissioner, supra at 690-691; United States v. American Bar Endowment, supra at 117-118.

To support their position that the cancellation of MHR Properties' leasehold interest and MHR Properties' purchase option was a contribution or gift to the University within the meaning of section 170(c), petitioners rely on (1) their own testimony and that of certain other witnesses and (2) labels, such as the label "gift", that were used by them and certain other witnesses at the trial in this case and that appeared in

certain documentary evidence. As for petitioners' reliance on certain testimony, we are not required to, and we shall not, accept the self-serving testimony of Mr. Signom and Ms. Signom, which was not corroborated by reliable evidence, that the cancellation of MHR Properties' St. Clair property interests was a contribution or gift within the meaning of section 170(c). See Lerch v. Commissioner, 877 F.2d 624, 631-632 (7th Cir. 1989), affg. T.C. Memo. 1987-295; Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). Nor shall we rely on the testimony of Mr. Deas, John Hart (Mr. Hart), and Fran Ary (Ms. Ary) to the extent such testimony suggests that petitioners, as the general partners of MHR Properties, made a contribution or gift to the University of MHR Properties' St. Clair property interests within the meaning of section 170(c).[7] The Court found the testimony of Mr. Deas to be evasive in responding to certain questions asked on cross-examination by respondent's counsel, the complete and truthful answers to which could have adversely affected petitioners' position under section 170.[8] The Court also found Mr. Hart, the Director of Legal

---

[7]We set forth infra note 10 our views regarding Mr. Nizny, another witness at the trial in this case.

[8]Despite his evasiveness in responding to certain questions, Mr. Deas was constrained, after having been admonished by the Court, to answer certain other questions, the answers to which supported respondent's position, and not petitioners' position,

(continued...)

Affairs and Counsel of the University, to be evasive in certain material respects during his testimony. In addition, we sometimes had serious reservations as to whether Mr. Hart was testifying from personal knowledge. As for Ms. Ary, Vice President for Advancement of the University, she did not begin working for the University until around 1993, a few years after the transaction in question. She testified that it was her "understanding" that petitioners had made a "gift" to the University in 1991 and that she obtained that "understanding" from Mr. Hart, a witness on whose testimony we generally are unwilling to rely.

As for petitioners' reliance on labels, such as the label "gift", it is the substance of what transpired with respect to the cancellation of MHR Properties' St. Clair property interests that is determinative for tax purposes, not the labels or terminology employed. See, e.g., Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978); Helvering v. F. & R. Lazarus & Co., 308 U.S. 252, 255 (1939); Gregory v. Helvering, 293 U.S. 465, 469 (1935). Consequently, we reject petitioners' reliance on labels to support their position under section 170.

Petitioners' position that they are entitled to a charitable contribution deduction as a result of the cancellation of MHR Properties' St. Clair property interests rests on the following contentions that they advance on brief: (1) Petitioners, as the

_____

[8](...continued)
under sec. 170.

general partners of MHR Properties, canceled MHR Properties' St. Clair property interests as early as July 6, 1991, and no later than July 26, 1991; (2) that cancellation was separate from the final exchange transaction that took place on August 1, 1991; and (3) petitioners did not expect to, were not entitled to, and did not receive any quid pro quo from the University in return for the cancellation of those property interests. Based on our examination of the entire record in this case, we reject all of those contentions.

We consider first petitioners' contention that the cancellation of MHR Properties' St. Clair property interests occurred as early as July 6, 1991, and no later than July 26, 1991. To support that contention, petitioners rely on the July 6 document and the July 22 document. As for the July 6 document on which petitioners rely, that document was prepared in anticipation of finalizing and closing the exchange transaction to which the University, Mr. Signom, and Mr. Felman had tentatively agreed and related only to MHR Properties' purchase option and not to MHR Properties' leasehold interest. Moreover, the July 6 document stated that Mr. Signom, instead of MHR Properties and/or Mr. Signom and Ms. Signom as the general partners of that partnership, was the grantor to the University of MHR Properties' purchase option. In addition, Mr. Signom signed the July 6 document in his individual capacity and not as a general partner or otherwise as a representative of MHR Properties. The signa-

ture of Ms. Signom does not appear on the July 6 document. No other individual signed the July 6 document as a representative of MHR Properties. Finally, although Mr. Signom sent the July 6 document to Mr. Packard, it was not sent to the University and was never recorded. On the instant record, we find that the July 6 document did not effect a cancellation of either MHR Properties' purchase option or MHR Properties' leasehold interest as of July 6, 1991, or as of any other date.

As for the July 22 document on which petitioners rely, on July 22, 1991, Brother Ploeger signed that document, as well as the July 22 St. Clair deed and the July 22 Ludlow deed, in anticipation of finalizing and closing the draft property exchange agreement. After Brother Ploeger signed the July 22 document and those two deeds, he sent them to Mr. Packard and Mr. Deas to be held in their custody and to be used only in the event that the parties to the draft property exchange agreement finalized and closed that agreement. The University, Mr. Signom, and Ms. Signom all anticipated that Mr. Signom and Ms. Signom would sign the July 22 document on behalf of MHR Properties at the July 31 anticipated closing. However, shortly after Brother Ploeger signed the July 22 document and sent it, along with the two deeds that he signed on July 22, 1991, to Mr. Packard and to Mr. Deas, Mr. Signom advised Mr. Deas that Ms. Signom would be unable to attend the July 31 anticipated closing. At Mr. Signom's request, Mr. Deas mailed the July 22 document to Mr. Signom in order to

have Ms. Signom sign it prior to that anticipated closing. Mr. Deas expected Mr. Signom to have that document signed by Ms. Signom and to bring it with him to the July 31 anticipated closing. On July 26, 1991, both Mr. Signom and Ms. Signom signed the July 22 document. We believe that the only reason petitioners signed the July 22 document on July 26, 1991, prior to the closing of the final exchange transaction on August 1, 1991, was because Ms. Signom was unable to attend that closing, and Mr. Signom requested that Mr. Deas mail the July 22 document to him so that Ms. Signom could sign it prior to the August 1 closing. The July 22 document, as signed by Brother Ploeger on behalf of the University on July 22, 1991, and by Mr. Signom and Ms. Signom on behalf of MHR Properties on July 26, 1991, was delivered at the August 1 closing.[9] On the instant record, we find that the July 22 document did not effect a cancellation of the Mumma/MHR Properties lease agreement, including MHR Properties' purchase option, as of July 26, 1991, or as of any other date prior to August 1, 1991, the date of the closing of the final exchange

---

[9]On the instant record, we reject petitioners' contention that they delivered the July 22 document to Mr. Deas on July 26, 1991, after they signed it and prior to the August 1 closing. Assuming arguendo that we were to have found that petitioners returned the July 22 document to Mr. Deas after they signed it on July 26, 1991, and before the August 1 closing, we nonetheless find on the record in this case that such a delivery of that document did not constitute a contribution or gift to the University of MHR Properties' St. Clair property interests within the meaning of sec. 170(c).

transaction pursuant to the final property exchange agreement.[10]

We next address petitioners' contention that the cancellation of MHR Properties' St. Clair property interests was separate from the final exchange transaction that took place on August 1, 1991. In support of that contention, petitioners maintain that the only reason that the final property exchange agreement required Mr. Signom to secure the cancellation of MHR Properties' leasehold interest and MHR Properties' purchase option was because "Mr. Felman needed contractual assurance that the option would be extinguished." If, as petitioners assert, the cancellation of MHR Properties' leasehold interest and MHR Properties'

---

[10]The record contains certain documents, including a number of documents that petitioners filed with their joint return, which indicate that the date of the cancellation of MHR Properties St. Clair leasehold interest and/or MHR Properties' purchase option was Aug. 1, 1991. For example, in Part IV of Section B of Form 8283 filed with petitioners' joint return, Brother Ploeger acknowledged that the University received the claimed donated property (MHR Properties' purchase option) on Aug. 1, 1991. In addition, the final acknowledgment document that was signed by petitioners sometime in 1991 or 1992 and by Brother Ploeger on behalf of the University sometime around Aug. 10, 1994, stated that the effective date of that document relating to the cancellation of MHR Properties' leasehold interest, including MHR Properties' purchase option, was Aug. 1, 1991. Even petitioners' appraiser Mr. Nizny, in Mr. Nizny's letter dated October 13, 1992, and Mr. Nizny's letter dated August 2, 1994, which purport to set forth Mr. Nizny's opinion of the value as of Aug. 1, 1991, of MHR Properties' purchase option and MHR Properties' leasehold interest, respectively, stated that the "arms-length transaction on the subject property * * * occurred on July 31, 1991". We are unwilling to rely on either of those letters or on Mr. Nizny's testimony because we found him to be not credible and unreliable. Nonetheless, those letters are noteworthy in that it must have been Mr. Signom to whom Mr. Nizny addressed those letters who informed Mr. Nizny that the "arms-length transaction on the subject property * * * occurred on July 31, 1991".

purchase option had been a gift to the University, which was completed no later than July 26, 1991, Mr. Felman would not have needed any contractual assurance as of August 1, 1991, that MHR Properties' St. Clair property interests had been canceled. However, on the record before us, we have found, and we believe that Mr. Felman (as well as the University) concluded, that the July 22 document did not effect a cancellation of MHR Properties' leasehold interest and MHR Properties' purchase option as of July 26, 1991, the date on which petitioners signed that document, or on any other date prior to August 1, 1991. That is why we believe that when the University, Mr. Signom, and Mr. Felman entered into the final property exchange agreement on August 1, 1991, that agreement (like the tentative property exchange agreement) required Mr. Signom to secure the cancellation of those property interests as part of the final exchange transaction which closed on August 1, 1991. On the instant record, we find that the cancellation of MHR Properties' St. Clair property interests was not separate from the final exchange transaction that took place at the August 1 closing. We further find on that record that that cancellation was effected as of August 1, 1991, pursuant to the final property exchange agreement as an integral part of that final exchange transaction.

We turn now to petitioners' contention that they did not expect to, were not entitled to, and did not receive any quid pro quo from the University in return for the cancellation of MHR

Properties' St. Clair property interests. On the instant record, we reject that contention. We have found on that record (1) that petitioners anticipated that Mr. Signom would receive quid pro quo from the University at the closing of the final exchange transaction on August 1, 1991, (2) that Mr. Signom was entitled under the final property exchange agreement to receive quid pro quo from the University in the final exchange transaction, and (3) that pursuant to that agreement he did receive such quid pro quo in that transaction. The quid pro quo that Mr. Signom received in the final exchange transaction totaled $295,963 and consisted of the Ludlow property valued in the final property exchange agreement and for Ohio transfer tax purposes at $253,000, $12,000 in cash, and relief from the mortgage of $30,963 to which the Irving property was subject on August 1, 1991, when Mr. Signom transferred it to the University.

Pursuant to the final property exchange agreement, the University also received quid pro quo in the final exchange transaction consisting of the cancellation of MHR Properties' St. Clair property interests by Mr. Signom and Ms. Signom as the general partners of MHR Properties and the transfer to the University by Mr. Signom in his individual capacity of the Irving property. The parties agree that MHR Properties' St. Clair property interests had a value of $111,500 when those interests were canceled. The parties do not agree on the fair market value of the Irving property that Mr. Signom transferred to the Univer-

sity as part of the final exchange transaction. At the time Mr. Signom transferred the Irving property to the University, it declared the value of that property for Ohio transfer tax purposes to be $165,000. Petitioners argue that the value of the Irving property for Ohio transfer tax purposes is not the fair market value of that property and that the value of that property for Ohio transfer tax purposes is irrelevant to a resolution of the issue before us under section 170.

On the record before us, we are unable to determine whether petitioners are correct that the value of the Irving property for Ohio transfer tax purposes was not the fair market value of that property when Mr. Signom transferred it to the University. However, we need not resolve that question in order to determine whether petitioners are entitled to a charitable contribution deduction under section 170 as a result of the cancellation of MHR Properties' St. Clair property interests. What is significant in our resolving that issue is that pursuant to Ohio law the University, as the grantee of the Irving property, declared the value of that property for Ohio transfer tax purposes to be $165,000, and Mr. Signom, as the grantor of that property, acquiesced in that valuation when, as required by Ohio law, he paid the Ohio transfer tax based on that declared value with respect to his conveyance of the Irving property to the University as part of the final exchange transaction that occurred on August 1, 1991.

On the instant record, we find that the quid pro quo which the University and Mr. Signom considered the University to have received in the final exchange transaction from petitioners as the general partners of MHR Properties and Mr. Signom in his individual capacity totaled $276,500.  That quid pro quo was less than the quid pro quo totaling $295,963 that the University and Mr. Signom considered Mr. Signom to have received from the University in that transaction.[11]

Based on our examination of the entire record in this case, we find that the cancellation of MHR Properties' St. Clair property interests did not constitute a contribution or gift of property to the University within the meaning of section 170(c).[12]  We further find on that record that petitioners have

[11]It is noteworthy that the July 22 document recited that the cancellation of the Mumma/MHR Properties lease agreement, including MHR Properties' purchase option, was "mutually benefi-cial" to the University and to MHR Properties and Mr. Signom and Ms. Signom as the general partners of MHR Properties.

[12]Assuming arguendo that we were to have found that peti-tioners established that the cancellation of MHR Properties' St. Clair property interests qualified as a contribution or gift to the University within the meaning of sec. 170(c), on the record before us, we find that petitioners have failed to show that they satisfied certain of the recordkeeping and return requirements for charitable contribution deductions prescribed by sec. 170(a) and sec. 1.170A-13, Income Tax Regs.

The recordkeeping and return requirements for charitable contribution deductions require a taxpayer, inter alia, to obtain a qualified appraisal (qualified appraisal) for donated property (except money and certain publicly traded securities) for which the taxpayer claims a deduction in excess of $5,000.  See sec. 1.170A-13(c)(1)(i) and (2)(i), Income Tax Regs.  The qualified
(continued...)

failed to show that they are entitled to a charitable contribu-
tion deduction under section 170(a) with respect to the cancella-
tion of those property interests.[13]  Accordingly, we sustain
respondent's determination disallowing that claimed deduction.

---

[12](...continued)
appraisal must be received by the donor before the due date,
including extensions, of the tax return on which a deduction is
first claimed under sec. 170 with respect to the donated prop-
erty.  See sec. 1.170A-13(c)(3)(i) and (iv)(B), Income Tax Regs.
The due date of petitioners' joint return, including extensions,
was Oct. 15, 1992.  On the record before us, we find that peti-
tioners have failed to establish that they received a qualified
appraisal before Oct. 15, 1992.  We decline to accept Mr. Nizny's
testimony and other evidence in the record that he prepared,
signed, and provided to Mr. Signom on Oct. 13, 1992, a letter
setting forth his appraisal with respect to the MHR Properties'
purchase option.  As we indicated supra note 10, we found Mr.
Nizny and the documents which he prepared that are in the record
to be unreliable.  Moreover, Mr. Nizny's testimony about Mr.
Nizny's letter dated October 13, 1992, is inconsistent with
certain documentary evidence in the record that he prepared
before the trial in this case.

[13]We have considered all of the arguments and contentions of
petitioners that are not discussed herein, including their
contentions relying on DuVal v. Commissioner, T.C. Memo. 1994-603
and Scheffres v. Commissioner, T.C. Memo. 1969-41.  We find those
arguments and contentions to be without merit.  We find DuVal and
Scheffres to be distinguishable from the instant case and peti-
tioners reliance on those cases to be misplaced.

Accuracy-Related Penalty

Respondent determined that petitioners are liable for the year at issue for the accuracy-related penalty under section 6662(a).  In their reply brief, petitioners contend that respondent's determination is wrong because (1) "they correctly reported their gift", and (2) they "had substantial authority for their return position that they gifted their St. Clair property interests" to the University.[14]

Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the tax resulting from a substantial understatement of income tax.  An understatement is equal to the excess of the amount of tax required to be shown in the tax return over the

---

[14]In their opening brief, petitioners assert:

> Petitioners properly disclosed the relevant facts relating to both the charitable contribution to the University and the like-kind exchange.  Accordingly, the substantial understatement penalty is not here applicable.

As we understand it, petitioners contend in their opening brief that they made adequate disclosure within the meaning of sec. 6662(d)(2)(B)(ii) and the regulations thereunder with respect to their claimed charitable contribution deduction.  In their reply brief, petitioners do not advance any argument relating to disclosure of the "relevant facts" in their joint return.  We conclude that petitioners have abandoned the contention in their opening brief that they made adequate disclosure within the meaning of sec. 6662(d)(2)(B)(ii) and the regulations thereunder. See Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988).  Assuming arguendo that we were to have concluded that petitioners did not abandon that contention, we find on the instant record that they did not adequately disclose the relevant facts surrounding the claimed charitable contribution.  See sec. 6662(d)(2)(B)(ii); sec. 1.6662-4(e)(1) and (f)(1) and (2), Income Tax Regs.

amount of tax shown in such return, see sec. 6662(d)(2)(A), and is substantial in the case of an individual if the amount of the understatement for the taxable year exceeds the greater of 10 percent of the tax required to be shown in the tax return for that year or $5,000, see sec. 6662(d)(1)(A).

The amount of the understatement is reduced to the extent that it is attributable to, inter alia, an item for which there is or was substantial authority. See sec. 6662(d)(2)(B)(i). In order to satisfy the substantial authority standard of section 6662(d)(2)(B)(i), a taxpayer must show that the weight of the authorities supporting the tax return treatment of an item is substantial in relation to the weight of authorities supporting contrary treatment. See Antonides v. Commissioner, 91 T.C. 686, 702 (1988), affd. 893 F.2d 656 (4th Cir. 1990); sec. 1.6662-4(d)(3)(i), Income Tax Regs. The substantial authority standard is not so stringent that a taxpayer's treatment must be one that is ultimately upheld in litigation or that has a greater than 50-percent likelihood of being sustained in litigation. See sec. 1.6662-4(d)(2), Income Tax Regs. A taxpayer may have substantial authority for a position even where it is supported only by a well-reasoned construction of the pertinent statutory provision as applied to the relevant facts. See sec. 1.6662-4(d)(3)(ii), Income Tax Regs. There may be substantial authority for more than one position with respect to the same item. See sec. 1.6662-4(d)(3)(i), Income Tax Regs.

On the instant record, we reject petitioners' contention that respondent's determination under section 6662(a) is wrong because "they correctly reported their gift". We have found on that record that petitioners are not entitled to the claimed charitable contribution deduction.

On the instant record, we also reject petitioners' contention that respondent's determination under section 6662(a) is wrong because they "had substantial authority for their return position". On that record, we find that all of the authorities on which petitioners rely to support their position regarding the claimed charitable contribution deduction are distinguishable from the instant case and that their reliance on those authorities is misplaced.

Based on our examination of the entire record before us, we find that petitioners have failed to establish error in respondent's determination that they are liable for the year at issue for the accuracy-related penalty under section 6662(a). Consequently, we sustain that determination.

To reflect the foregoing and the concessions of petitioners,

<u>Decision will be entered</u>

<u>for respondent</u>.